The STATE of Ohio, Appellee and Cross–Appellant,

v.

ALFIERI, Appellant and Cross–Appellee.

[Cite as *State v. Alfieri* (1998), 132 Ohio App.3d 69.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–970490, C–970526.

Decided Dec. 31, 1998.

72

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Steven W. Rakow,* Assistant Prosecuting Attorney, for appellee and cross–appellant.

*Douglas Mansfield,* for appellant and cross–appellee.

---

SUNDERMANN, Presiding Judge.

On November 27, 1996, at approximately 7:30 a.m., Rene Andrews, then six months' pregnant, was ejected from the driver's-side window of her white Volkswagen Cabriolet after it collided with a flatbed truck parked on the berm of northbound I–71 just past the Red Bank Road entrance. Andrews came to rest, face down, on the interstate, sustaining pervasive injuries. Shortly thereafter,

surgeons removed from Andrews's damaged uterus her twenty-five–week-old[1] unborn child, which had bled to death after the impact of the crash caused Andrews's placenta to separate from her uterus. Andrews remained in the intensive-care unit for three and a half days and underwent four surgeries. She was then transferred to the regular portion of the hospital, where she remained for over a week before being transferred to assisted-care facilities for two more months. Finally, on February 13, 1997, she returned home.

On January 2, 1997, the Hamilton County Grand Jury issued a two-count indictment against defendant-appellant Tracie Alfieri in connection with the collision. Alfieri was charged with (1) aggravated vehicle homicide, in violation of R.C. 2903.06(A), for recklessly causing the unlawful termination of Rene Andrews's pregnancy while operating a motor vehicle, and (2) aggravated vehicular assault, in violation of R.C. 2903.08(A), for recklessly causing serious physical harm to Rene Andrews while operating a motor vehicle.

Alfieri filed a motion to dismiss the aggravated-vehicular-homicide charge, asserting that R.C. 2903.06(A) was unconstitutional. The trial court overruled this motion and the case proceeded to trial. At the conclusion of four days of trial, the case went to the jury, which deliberated for a day and a half before returning guilty verdicts on both charges. After examining the completed presentence report and hearing mitigation testimony presented on Alfieri's behalf, the trial court sentenced Alfieri to serve one year of incarceration on the aggravated-vehicular-homicide charge and six months of incarceration on the aggravated-vehicular-assault charge. The trial court ordered that the sentences run consecutively.

Alfieri has filed a timely appeal from the trial court's judgment, asserting five assignments of error. By leave of this court, the state has filed, under case No. C–970526, a cross-appeal that we have consolidated with Alfieri's appeal, which is separately numbered C–970490. We have reviewed the parties' assignments of error. We conclude that Alfieri's five assignments are without merit. Accordingly, we affirm her convictions. We also conclude that the assignment raised by the state in its cross-appeal is moot. Therefore, we do not address it. Before we discuss the assignments more fully, it is appropriate to detail the circumstances precipitating the tragic incident that gave rise to the prosecution of Alfieri.

## I. FACTUAL BACKGROUND

The testimony presented by the state at trial established that at approximately 7:00 a.m. on November 27, 1996, Andrews left her home in order to go to work.

---

1. The surgeon estimated that the fetus was between the twenty-third and the twenty-fifth weeks of gestation.

Although Andrews was unable to recall the events that unfolded following her departure from home, the testimony of other witnesses established that at approximately 7:26 a.m., she was traveling on Red Bank Road, directly behind a Coca Cola truck. The truck was moving slowly up a hill leading to the entrance to I–71. Michael Grisi and David Bahler were traveling directly behind Andrews in two separate cars. Grisi testified that Andrews moved into the left lane in front of Alfieri, passed the slow-moving Coca Cola truck, and then moved back into the right lane. He noticed that Andrews's lane change caused Alfieri to slow down and that Alfieri began to gesture at Andrews. Alfieri moved into the right lane behind Andrews and followed her onto the entrance ramp to I–71. According to Grisi and Bahler, Alfieri then began to drive erratically, moving from side to side as if she wanted to pass Andrews.

As the group neared the end of the entrance ramp, Andrews, still in front of Alfieri, remained in the same lane, which eventually provided access to the next exit from the interstate. Alfieri moved one lane to the left into the first regular lane of interstate traffic. According to Grisi and Bahler, Alfieri then pulled next to Andrews and made obscene gestures. Andrews responded by moving one lane to the left, behind Alfieri. But just as Andrews was completing her lane change, Alfieri applied her brakes suddenly and with such force that the nose of her Pontiac Grand Am dipped down. Grisi and Bahler testified that, at the time Alfieri braked, no traffic or other obstruction existed in front of her that would have warranted this abrupt action. It was their belief that she had intentionally given Andrews a "brake job," or had intentionally applied her brakes in an abrupt manner for the sole purpose of startling Andrews and causing her to slow down or change lanes.

In response to Alfieri's sudden application of her brakes, Andrews hit her own brakes and jerked her steering wheel to the right in an effort to avoid a collision with Alfieri. Unfortunately, this caused her to lose control of her car, which veered to the right and crashed into a disabled flatbed truck parked on the interstate. Upon impact, she was thrown from her car.

In the meantime, Alfieri continued to drive to work along I–71. Grisi and Bahler, angered by her actions, drove after her and recorded her license-plate number.

At trial, several of Alfieri's co-workers testified that they discussed the circumstances of Andrews's collision with Alfieri on the morning of November 27, 1996. One co-worker testified that Alfieri told her that she thought she had caused an accident because she had slammed her brakes on in order to avoid traffic in front of her. Both co-workers testified that Alfieri told them that Andrews "cut her off" and that she did not "take shit" from anyone on the road.

Alfieri also testified at trial. She contended that when Andrews changed lanes in front of her on Red Bank Road, she was forced to slam on her brakes in order to avoid hitting Andrews. As a result, she honked her horn and flashed her headlights at Andrews, who gestured at her and appeared agitated. Furthermore, Alfieri contended that she had properly attempted to pass Andrews on Red Bank Road (not on the entrance ramp), but had been prevented from doing so because Andrews insisted on "matching" her speed as she tried to pass. Because she needed to get on northbound I–71, she was forced to merge to the right behind Andrews. Alfieri claimed that Andrews then hit her brakes abruptly, nearly causing a collision. As a result, she dropped back from Andrews and moved to the side of the lane to see if there was an obstruction in the road that would have caused Andrews to brake so suddenly. She saw nothing.

Alfieri also contended that when she passed Andrews on I–71, both she and Andrews gestured at each other. She claimed, however, that the gestures were non-obscene. And, with regard to the moments before the crash, Alfieri stated that she thought Andrews was going to use the next exit and did not even realize that she was moving into the lane behind her. She also stated that she had applied her brakes because she believed she was coming up too quickly on the traffic ahead of her; she had not done so to startle or harm Andrews.

Finally, Alfieri testified that she did not actually see the crash occur and did not observe that Andrews's car had collided with a truck until after she had passed the next exit. Therefore, she proceeded to work, where she called the authorities to report that she might have information relative to Andrews's accident.

## II. ALFIERI'S ASSIGNMENTS OF ERROR

## A. CONSTITUTIONAL ISSUES

In her first assignment of error, Alfieri challenges the constitutionality of the legislation that amended the statutory definition in Ohio's aggravated-vehicular-homicide statute, R.C. 2903.06(A), to encompass the unlawful termination of another's pregnancy and that added new definitions to R.C. 2903.09.[2] She claims that the law, as amended, violates her rights to equal protection of the law, due process, and freedom from cruel and unusual punishment. She also contends that the law impermissibly establishes and fosters religious purposes and beliefs.

---

2. The Tenth Appellate District, in *State v. Coleman* (1997), 124 Ohio App.3d 78, 705 N.E.2d 419, and the Second Appellate District, in *State v. Moore* (Oct. 30, 1998), Greene App. No. 97CA137, unreported, 1998 WL 754603, have reviewed similar constitutional challenges to the amending legislation. We have found these cases to be instructive in reviewing Alfieri's challenges.

R.C. 2903.06(A), as amended by Am.Sub.S.B. No. 239, provides:

"No person, while operating or participating in the operation of a motor vehicle * * * shall recklessly cause the death of another or the unlawful termination of another's pregnancy."

R.C. 2903.09(A) defines the unlawful termination of another's pregnancy as "causing the death of an unborn member of the species homo sapiens, who is or was carried in the womb of another, as a result of injuries inflicted during the period that begins with fertilization and that continues unless and until live birth occurs."

Further, the legislature has specifically provided that the definition of "unlawful termination of another's pregnancy" is not to be applied to consensual abortions and exempts pregnant women from prosecution.

## 1. EQUAL PROTECTION OF THE LAW

Alfieri contends that R.C. 2903.09(C) impermissibly exempts pregnant women from prosecution under R.C. 2903.06(A) in violation of the Equal Protection Clause. She contends that no rational basis exists for this disparate treatment. This argument lacks merit.

Equal protection under the law requires that no person or class of persons be denied the protection afforded by the law to other persons or classes in like circumstances.[3] The Equal Protection Clause does not prevent all classification, however. It simply forbids laws that treat persons differently when they are otherwise alike in all relevant respects.[4]

We are in accord with the Supreme Court of Minnesota's determination in *State v. Merrill,*[5] and with the Second Appellate District's determination in *State v. Moore,*[6] that a criminal defendant who assaults a pregnant woman, causing the death of the fetus she is carrying, is not similarly situated to a pregnant women who elects to have her pregnancy terminated by one legally authorized to perform the act. Furthermore, we conclude that R.C. 2903.06(A) is rationally related to the legitimate governmental interest of protecting unborn

---

3. *Nordlinger v. Hahn* (1992), 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1; *Toledo v. Wacenske* (1994), 95 Ohio App.3d 282, 642 N.E.2d 407; *Moore, supra.*

4. *Huntington Natl. Bank v. Limbach* (1994), 71 Ohio St.3d 261, 262, 643 N.E.2d 523, 523–524.

5. (1990), 450 N.W.2d 318, certiorari denied (1990), 496 U.S. 931, 110 S.Ct. 2633, 110 L.Ed.2d 653.

6. *Supra* at footnote 2.

children from criminal activity.  Thus, we reject Alfieri's equal-protection challenge.

## 2.  DUE PROCESS

Alfieri mounts two due-process attacks.  First, she contends that R.C. 2903.06(A) is so vague that it violates the Due Process Clause of the Fourteenth Amendment because it fails to adequately define when life begins and ends.  As a result, Alfieri argues, the statute invites arbitrary and discriminatory enforcement.  We disagree.

A state criminal statute is void for vagueness if it fails to define the criminal offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[7]  Contrary to Alfieri's contention, the definition of the conduct prohibited by R.C. 2903.06(A) does not bring into play any ambiguities that may attend the debate over the question of when the life of a human person begins or ends.[8]  Instead, the section makes relevant a narrow inquiry into whether one has recklessly caused the "unlawful termination of another's pregnancy."  R.C. 2903.09(A) defines precisely what is meant by the phrase "unlawful termination of another's pregnancy":

" 'Unlawful termination of another's pregnancy' means causing the death of an unborn member of the species homo sapiens, who is or was carried in the womb of another, as a result of injuries inflicted *during the period that begins with fertilization and that continues unless and until live birth occurs.*"  (Emphasis added.)

These statutes, in combination, provide definite notice to ordinary persons that the unborn are protected from the moment of fertilization.  Furthermore, by defining with clarity and precision the times at which criminal liability may attach for harm caused to a fetus, the statutes guard against arbitrary and discriminatory enforcement.

In her second due-process challenge, Alfieri contends that R.C. 2903.06(A) violates the Due Process Clause because it has the potential of predicating criminal liability on the death of a *nonviable* fetus.  Relying on *Roe v. Wade*[9] and its progeny, Alfieri contends that the state does not have a compelling interest in protecting the life of a fetus until it reaches the point of viability.

---

7.  *Kolender v. Lawson* (1983), 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903, 909.

8.  *Merrill, supra.*

9.  (1973), 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147.

In *Coleman,* the Tenth Appellate District recently rejected such an argument. As the court noted, a substantive due-process case requires the denial of a fundamental liberty interest.[10] The court concluded, however, that the appellant had failed to identify any legitimate fundamental interest and stated, "[Q]uite simply, there has never been any notion that a third party, as appellant here, has a fundamental liberty interest in terminating another's pregnancy."[11] Furthermore, the court noted that the holding of *Roe* was not inconsistent with a compelling state interest in protecting a fetus prior to viability. Rather, in *Roe,* the United States Supreme Court recognized that the state had an "important and legitimate interest in protecting the potentiality of human life,"[12] but held that, at a certain stage of pregnancy, a woman's privacy interest in determining whether to terminate her pregnancy outweighed this interest. Certainly, the state's interest in protecting pregnant women and unborn children outweighs a third party's right to terminate another's pregnancy by specifically defined conduct that is deemed to be criminal.

For these reasons, we reject Alfieri's due-process challenges.

### 3. CRUEL AND UNUSUAL PUNISHMENT

■ Alfieri argues that the sentence imposed upon her by the trial court amounts to cruel and unusual punishment in violation of the Eighth Amendment. Alfieri's complaint is based on the fact that a woman and a doctor may freely abort a woman's pregnancy while Alfieri is made to suffer punishment for the same act of terminating the pregnancy.

In reviewing a similar constitutional challenge in *Coleman,* the Tenth Appellate District noted that there is a rational basis to distinguish between the woman who elects to terminate her pregnancy, on one hand, and a third party who criminally assaults the woman and injures the unborn child, on the other. The court also observed that the "Eighth Amendment does not require strict proportionality between crime and sentence but, rather, forbids only extreme sentences that are grossly disproportionate to the crime."[13]

The offense committed in this case is a third-degree felony.[14] The maximum penalty is five years' incarceration. Alfieri, however, was sentenced to serve only

10. *Washington v. Glucksberg* (1997), 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772.

11. *Coleman, supra,* 124 Ohio App.3d at 81, 705 N.E.2d at 421.

12. 410 U.S. at 162, 93 S.Ct. at 731, 35 L.Ed.2d at 182.

13. *Coleman, supra,* 124 Ohio App.3d at 82, 705 N.E.2d at 422.

14. R.C. 2903.06(B).

one year of incarceration, the minimum term.[15] We conclude that Alfieri's one-year sentence is neither extreme nor grossly disproportionate to her crime. Accordingly, we reject her Eighth Amendment challenge.

## 4. ESTABLISHMENT OF RELIGION

■ Alfieri contends that R.C. 2903.06(A) violates the First and Fourteenth Amendments to the United States Constitution and Section 7, Article I of the Ohio Constitution, because it attempts to establish and foster religious beliefs and purposes. She asserts that the legislature, by enacting Am.Sub.S.B. No. 239, was in effect attempting to define "life" as beginning at the point of conception. We are not persuaded by this argument.

Under the test set forth by the United States Supreme Court in *Lemon v. Kurtzman*,[16] a law does not violate the Establishment Clause if (1) it has a secular purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement with religion.[17]

Inquiry into the legislative purpose of R.C. 2903.06(A) affords no basis for a conclusion that the legislative intent was to advance religion. On the contrary, the legislature clearly stated, in enacting the statute, that its intent was to "promote the interests of the state and of the mother in protecting an unborn that the mother wants to carry until birth from being harmed by another person's criminal conduct."[18] It also stated that "[it did] not intend to create or establish a legal or political precedent for creating any rights to be exercised by or on behalf of the unborn beyond those specifically established in this act."[19] We are aware of nothing, nor has Alfieri pointed to anything, that undermines the legislature's stated intent. Accordingly, we conclude that the statute has a legitimate secular purpose.[20] Further, it is clear to us that the primary effect of the statute is to impose liability upon persons who, by their own criminal conduct, terminate another person's pregnancy. This effect neither advances nor inhibits religion. Finally, the law does not foster, to any degree, government entanglement with

---

**15.** R.C. 2929.14(A)(3).

**16.** *Lemon v. Kurtzman* (1971), 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745.

**17.** *Lemon v. Kurtzman, supra,* 403 U.S. at 612–613, 91 S.Ct. at 2111, 29 L.Ed.2d at 755–756.

**18.** Am.Sub.S.B. No. 239, Section 4 (146 Ohio Laws, Part IV, 10416, 10452).

**19.** *Id.*

**20.** See, also, *State v. Bauer* (Minn.App.1991), 471 N.W.2d 363 (holding that Minnesota's fetal homicide law has a secular purpose and does not violate the Establishment Clause).

religion; it creates no supervision or oversight of religious practices. Therefore, we reject Alfieri's Establishment Clause challenge.

For the reasons stated above, we conclude that R.C. 2903.06(A) is constitutional. Therefore, we overrule the first assignment of error.

## B. SUFFICIENCY AND WEIGHT OF THE EVIDENCE

Alfieri argues her second and third assignments of error together. In these assignments, she asserts that (1) the trial court erred in overruling her Crim.R. 29 motion for acquittal, (2) her conviction was not supported by sufficient evidence, and (3) it was against the weight of the evidence.

### 1. SUFFICIENCY

For this court to reverse a conviction based on insufficient evidence, we must conclude, after viewing the evidence in a light most favorable to the state, that no rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[21] Likewise, to invalidate a trial court's denial of a Crim.R. 29 motion for acquittal, we must determine that the evidence is such that reasonable minds could not differ in concluding that the state had failed to prove each material element of the crime beyond a reasonable doubt.[22] In the review of such a motion, the evidence must be viewed in a light most favorable to the state.[23]

Alfieri was charged with aggravated vehicular homicide and aggravated vehicular assault. Thus, the state was required to prove, beyond a reasonable doubt, that she "recklessly cause[d] * * * the unlawful termination of another's pregnancy" while operating a motor vehicle and "recklessly cause[d] serious physical harm to another person" while operating a motor vehicle.[24] Alfieri contends, however, that the state failed to adduce sufficient evidence at trial to prove, beyond a reasonable doubt, that she acted recklessly. We disagree.

R.C. 2901.22(C) defines criminal recklessness. It provides:

"A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain

---

21. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

22. See *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus; *State v. Brown* (Sept. 25, 1996), Hamilton App. No. C–950300, unreported, 1996 WL 539785.

23. *State v. Evans* (1992), 63 Ohio St.3d 231, 248, 586 N.E.2d 1042, 1056–1057, certiorari denied (1992), 506 U.S. 886, 113 S.Ct. 246, 121 L.Ed.2d 179.

24. See R.C. 2903.06(A) and 2903.08(A).

result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."

The evidence presented by the state, viewed in the light most favorable to it, demonstrated that Alfieri intentionally applied her brakes in an abrupt manner for the sole purpose of startling Andrews and causing her to back off or change lanes. Given this evidence, we are unable to conclude that no rational trier of fact could have found that the state proved, beyond a reasonable doubt, that Alfieri acted recklessly. Rather, we believe that sufficient evidence was adduced to support the conclusion that, with heedless indifference to the consequences, she perversely disregarded the known or significant possibility that her conduct was likely to cause an "accident." Accordingly, we conclude that Alfieri's convictions were supported by sufficient evidence and that the trial court properly denied her Crim.R. 29 motion for acquittal.

## 2. WEIGHT

Alfieri contends that the manifest weight of the evidence does not support the conclusion that she acted recklessly. We disagree.

To reverse a conviction on a manifest-weight-of-the-evidence claim, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine if the fact-finder "lost its way."[25] Further, our discretionary power to grant a new trial may only be exercised in the exceptional case in which the evidence weighs heavily against conviction.[26]

Although the evidence offered by the state and the defense in explanation of why Alfieri suddenly applied her brakes was in conflict, it was primarily the obligation of the jury to assess the credibility of the witnesses and to weigh the evidence. In carrying out this obligation, the jury was free to accord greater weight to the testimony of Grisi and Bahler than to the testimony of Alfieri, as it apparently did. Based on our review of the record in this matter, we are unable to conclude that the jury lost its way in assessing the witnesses' credibility. Furthermore, we cannot say that this is one of the exceptional cases where the evidence weighed heavily against conviction. We conclude, therefore, that Alfieri's conviction was not against the weight of the evidence.

For these reasons, we overrule the second and third assignments of error.

---

**25.** *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 218–219, 485 N.E.2d 717, 720–721, quoted in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 549.

**26.** *Id.*

## C. INTRODUCTION OF PHOTOGRAPH

In her fourth assignment of error, Alfieri asserts that the trial court erred in admitting, over her counsel's objection, one color photograph of Andrews's dead fetus. She claims that this photograph was devoid of probative value and was admitted solely for the purpose of inflaming the jury's passion to her substantial prejudice.

When considering the admissibility of photographic evidence under Evid.R. 403, a court must determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant.[27] The admission or exclusion of such evidence is left to the discretion of the trial court.[28] On appeal, we are not to substitute our judgment for that of the trial court. Rather, "we will not interfere with the trial court's balancing of probativeness and prejudice 'unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby * * *.' "[29] The term "abuse of discretion" connotes more than error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable.[30]

The photograph at issue was taken by the hospital's grieving team at the direction of Dr. Jay Johannigman, Andrews's treating surgeon, shortly after the fetus was removed from her uterus. It depicts Andrews's deceased fetus, fully clothed in a knitted cap and long gown; no portion of the fetus's body, with the exception its face and hands, are visible in the photograph and no outward signs of physical injury are apparent. The photograph was identified at trial by Johannigman in connection with his testimony regarding the fetus's cause of death and by Rohe, Andrews's mother-in-law, in connection with her testimony regarding the fact of the fetus's death.

Given that (1) only one photograph was introduced into evidence, (2) the photograph was not unduly gruesome, and (3) it was probative of a material fact (that the pregnancy was terminated as a result of the collision) and was illustrative of medical testimony on that issue, we are unable to conclude that, in

---

**27.** *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273, citing *State v. Tingler* (1972), 31 Ohio St.2d 100, 103–104, 60 O.O.2d 81, 83–84, 285 N.E.2d 710, 713, and *State v. Rahman* (1986), 23 Ohio St.3d 146, 152, 23 OBR 315, 320, 492 N.E.2d 401, 407.

**28.** *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 400–401, 473 N.E.2d 768, 791, certiorari denied (1984), 472 U.S. 1012, 105 S.Ct. 2714, 86 L.Ed.2d 728.

**29.** *State v. Slagle* (1992), 65 Ohio St.3d 597, 602, 605 N.E.2d 916, 923, quoting *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 302, 224 N.E.2d 126, 130.

**30.** *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

determining that the probative value of this photograph was not substantially outweighed by the danger of unfair prejudice to Alfieri, the trial court acted so unreasonably, arbitrarily, or unconscionably as to have abused its discretion. Therefore, we overrule the fourth assignment of error.

## D.   PROSECUTORIAL MISCONDUCT

In her fifth and final assignment of error, Alfieri asserts that the prosecuting attorneys, by their misconduct during trial and closing argument, violated her constitutional rights by depriving her of a fair trial.   The state contends that none of comments cited by Alfieri rise to the level of misconduct.

▮▮▮▮ Generally, the conduct of a prosecuting attorney cannot be made a ground of error unless the conduct deprived the defendant of a fair trial.[31] Under Ohio law, the test for whether prosecutorial misconduct may serve as the basis for reversing a conviction is, first, whether the prosecutor's remarks were improper, and, if so, whether they prejudicially affected substantial rights of the accused.[32]

The most significant issues presented in this assignment arise from two separate remarks made by one of the assistant prosecutors during rebuttal closing argument.   In one instance, the prosecutor asserted his personal opinion as to the credibility of David Bahler, a key witness for the state, stating:

"I've been practicing law and doing these [sic] for a long time.   David Bahler is one of the best witnesses I've ever seen or had in a courtroom.   This is a man who was absolutely sincere, who was absolutely sure of what took place on that day.   He chased her down.   There wasn't a doubt in his mind as regards to what she did, and her attack on Rene.   Not a single hesitation.   He tried to shame her into stopping and going back and helping Rene.   He couldn't even make her do that.   The woman has no shame."

In the second instance the prosecutor stated, in reference to the fact that the defense had not introduced into evidence the final accident report prepared by the police:

"It's interesting that they don't want you to examine everything.   Oh, no, let's hide from the final report that Lieutenant Daudistel filed.   We don't even introduce that.   We won't have that blown up, because the preliminary reports

---

**31.**   *Maurer, supra.*

**32.**   *State v. Lott* (1990), 51 Ohio St.3d 160, 555 N.E.2d 293, certiorari denied (1990), 498 U.S. 1017, 111 S.Ct. 591, 112 L.Ed.2d 596;   *State v. Smith* (1984), 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883;   *State v. Hart* (1994), 94 Ohio App.3d 665, 641 N.E.2d 755.

which were filed and made up in the middle of the—[the prosecutor was then interrupted by defense counsel's objection]."

The remaining instances of alleged misconduct occurred without objection from Alfieri's trial counsel. Alfieri is, therefore, precluded from predicating error on these alleged incidents of misconduct, except to the extent that they reflect the tenor of the prosecutor's conduct during the whole trial.[33]

The prosecutor's act of personally vouching for the credibility of the state's witness was an invasion of the province of the jury and was in direct violation of DR 7–106(C)(4) of the Code of Professional Responsibility. As such, it was clearly improper and constituted misconduct. Furthermore, the prosecutor's suggestion to the jury that defense counsel was "hiding" evidence constituted an improper denigration of the role of defense counsel.[34]

We must now determine if these improper remarks were so prejudicial as to deny Alfieri a fair trial. As we stated in *Hart*,[35] it is not enough that the prosecutor's remarks were undesirable or even universally condemned; the remarks must have so infected the trial with unfairness as to make the resulting conviction a denial of due process.[36]

Having assessed the effect of the misconduct within the context of the entire case, and more particularly the entire closing argument,[37] we are unable to conclude that it had the effect of depriving Alfieri of a fair trial. Accordingly, we overrule her fifth assignment of error.

## III. STATE'S CROSS–APPEAL

In the single assignment of error raised in its cross-appeal, the state asserts that the trial court erred in instructing the jury on the issues of "assured clear distance" and "sudden stop." In light of our resolution of the foregoing assignments of error brought by Alfieri, this issue is rendered moot. Therefore, we do not address it.

---

33. *State v. Keenan* (1993), 66 Ohio St.3d 402, 613 N.E.2d 203.

34. *Hart, supra; State v. Smith* (1998), 130 Ohio App.3d 360, 720 N.E.2d 149.

35. *Supra,* 94 Ohio App.3d at 674, 641 N.E.2d at 761.

36. See *Darden v. Wainwright* (1986), 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144; *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431.

37. *Keenan, supra.*

## IV.   CONCLUSION

For the reasons stated above, we affirm the trial court's judgment.

*Judgment affirmed.*

GORMAN and PAINTER, JJ., concur.