OPINION.
Defendant-appellant, Marcus Wilson, was convicted of the aggravated murder of Christopher Parks, as well as two gun specifications. Wilson was sentenced to life imprisonment for the aggravated murder and to a consecutive three-year term on one of the gun specifications. On appeal, Wilson raises fourteen assignments of error.
 I. Background Facts
On Saturday, January 29, 2000, at about 11:00 a.m., Shawnte Nichols was driving in the Kennedy Heights suburb of Cincinnati with her cousin, Schnequa Green, and her two children. Nichols saw three black male teenagers standing on the side of Kennedy Avenue. Her attention was drawn to them because it was early in the day and it was cold outside.
As one of the young men turned to walk away from the two others, Nichols heard a gunshot and saw him fall. She saw the taller of the two remaining teenagers fire a black gun at the fallen boy and then stand over his body and shoot him in the head. Nichols asked Green to call the police.
Nichols testified that the taller boy was wearing a black bubble coat, and that the shorter boy was wearing a jean coat with multiple colors on the back of it. Nichols could not see the faces of the two young men because they were wearing skullcaps and hoods. She saw them run down Zinsle Avenue. When Nichols got out of her car and walked over to the fallen boy, she recognized him from the neighborhood as Christopher Parks.
Nichols testified that she had seen Marcus Wilson many times in Kennedy Heights, and that his height, weight, and body type were consistent with that of the shooter.
Schnequa Green testified that she, too, had seen the shooting, but that she was unable to see the faces of the perpetrators.
At the same time that Nichols and Green were driving on Kennedy Avenue, Kenneth Dudley was a passenger in a car traveling in the opposite direction. Dudley noticed the three young men on the side of the street. Dudley saw one young man turn to walk away from the others, when he heard a pop and saw him fall to the ground. Dudley saw the taller of the remaining two individuals walk up to the victim and fire at least two more shots at him. Dudley then saw the two young men run back down the street toward Zinsle Avenue. He did not see their faces.
Sharon Davis lived in a house on Kennedy Avenue, just across the street from where the shooting happened. She testified that she knew Marcus Wilson. He had previously been to her home, and she had once braided his hair. Davis was in her second-floor bedroom when she saw two people walking up the street from Zinsle Avenue. Davis thought one of them was Wilson, based upon the way he was walking. She testified that his companion was obviously shorter than him.
Davis saw another person walk down the street toward the two others and talk to them. Just as Davis began to turn away from her window, she heard a gunshot. Davis went downstairs to see what had happened and saw a young man lying on the ground. At that time, the person who Davis thought was Wilson was running from the scene with his shorter companion toward Zinsle Avenue.
The following day, Davis told police that she had assumed the person she had seen was Marcus Wilson, but that she had not seen his face. She also gave police Donte Harris's nickname, "Flamboyant."
Melanie McClain, the teenaged daughter of Sharon Davis, testified that she had gone to school with Marcus Wilson, and that she also knew Donte Harris. According to McClain, Wilson and Harris were best friends and were together all the time. The day before the shooting, she had seen Wilson, Harris, a boy nicknamed "Scooter," and others talking. She heard Wilson say that he had been robbed by Christopher Parks's brother, Rick, and that he was going to seek revenge. The others in the group were teasing and taunting Wilson. In response, Wilson said that he was going to "get [Parks] back."
The following morning, McClain was home with her mother when she heard gunshots. She looked out the window and saw two people running. One was a tall person with a black bubble coat and dark pants; the other was a shorter person with dark pants. McClain could not see their faces, but indicated that they matched the physical characteristics of Wilson and Harris. McClain said that the two were running down Zinsle Avenue, in the direction of the home of Aisha Hedges.
Aisha Hedges testified that she knew Wilson, Harris, and Parks. She said that, in the months before Parks was shot, she had seen Wilson and Harris almost every day. She testified that Wilson was at her home every day and frequently slept there whenever he did not go to his own home.
On the morning of the shooting, Hedges was in her second-floor bedroom when she heard gunshots. When she looked out her window, she saw Wilson and Harris jogging down Zinsle Avenue towards her house. She saw the two part company — Wilson went through a park, while Harris went down toward another street. Hedges testified that, although she was not wearing her prescribed glasses, she was positive that they were Wilson and Harris. She testified that Wilson was wearing a black bubble coat and a black skullcap, and that Harris was wearing a blue-jean coat and greenish skullcap. Hedges testified that she had never seen Wilson with a gun, but that she had heard him say that he had one.
Cincinnati Police Officer Kathy Horn received a radio dispatch regarding the shooting, including descriptions of the young black men involved. One description was for a seventeen-year-old, approximately five feet, three inches tall, with an average to stocky build, wearing a black skullcap and a dark denim jacket with a tan color and blue jeans. The other was for a fifteen-year-old, approximately five feet, ten inches tall, with light skin and a black bubble coat.
Another police cruiser had already responded to the scene, so Officer Horn took a perimeter position on Zinsle Avenue. She saw a young man, whom she later determined to be Dewayne Cunningham, walking up behind her cruiser. She stepped out of her cruiser and stopped him because his clothing matched the general description of one of the suspects. Cunningham was tall and thin and wore a dark bubble coat.
Officer Horn told Cunningham that there had been an incident, and that she was not saying that he had done anything, but that she wanted to check any possible involvement in the case. As Officer Horn was about to pat Cunningham down for weapons and place him in her cruiser, another car stopped near her car, and two men got out and ran towards Cunningham, yelling at him. During the incident, Cunningham kept his hands on the cruiser as he had been instructed. The men appeared to be angry with Cunningham and told him that they were going to "get" him. Officer Horn kept the men away from Cunningham, and the men got in their car and left. Officer Horn later learned that the men were friends of the shooting victim, Christopher Parks.
Dewayne Cunningham testified that he knew Marcus Wilson and Donte Harris. On the day of the shooting, Cunningham was wearing a black bubble coat and a black and red hat as he walked to the home of Aisha Hedges, on Zinsle Avenue. As he walked towards Officer Horn's cruiser, the officer detained him. Just then some of Christopher Parks's friends jumped out of another car and tried to grab him, but Cunningham kept his hands on the police cruiser.
Cunningham testified that he was taken to the police station, where officers tested his hands for gunshot residue. Though he tested positive for one particle of gunshot residue, Cunningham denied firing a gun that day. Cunningham said that he had shaken the hand of "Scooter," a friend of Wilson and Harris. After being interviewed by the police, Cunningham directed them to the homes of Wilson and Harris.
Cunningham said that, the night before the shooting, he had seen Wilson and Harris. Wilson told him that he had been robbed by Christopher Parks and his brother, Rick. Wilson was angry and said that he would get back at Parks. At the time, Wilson was holding a black gun. Cunningham testified that he had seen Wilson with the same gun a few months earlier.
Michael Trimpe, a criminalist with the Hamilton County Coroner's crime laboratory, testified that he found two particles of primer residue on a sleeve of Wilson's black bubble coat. He had also analyzed an adhesive lifter from Dewayne Cunningham's left palm, and he found one particle of primer residue on it. Trimpe explained that the presence of primer residue would be consistent with a person having fired a weapon, having been in the vicinity of a fired weapon, or having touched an item with primer residue on it.
Another criminalist, Ronald R. Camden, testified that he had been on the scene after the shooting. He said that two Remington Peters .38 special cartridges had been found in front of a house on Zinsle Avenue, and that two more cartridges were recovered at a park entrance beyond a walkway off of Zinsle.
Cincinnati Police Officer Elton Shaw testified that he had responded to a radio dispatch regarding the shooting on Kennedy Avenue. He said that a probation officer had called for assistance. While the probation officer had Dewayne Cunningham subdued, Officer Shaw handcuffed Cunningham. Officer Shaw testified that Cunningham was not cooperative about identifying himself.
Officer Shaw testified that, the following morning, he and another officer responded to a radio dispatch at Wilson's house. Wilson's grandfather let the police officers into the house and said that his grandson wanted to speak with someone about the shooting that had happened the day before. When the officers walked into the living room, they saw Marcus Wilson sitting next to his uncle on a sofa, being held down by his uncle. Officer Shaw testified that it was obvious that the uncle was trying to detain Wilson. Wilson appeared to be somewhat upset and emotional. Wilson told the officer that he wanted to talk to the police.
William Schrand, a senior firearms examiner with the Hamilton County Coroner's crime laboratory, testified that he examined a bullet that he had recovered from Christopher Parks's jacket, as well as three bullets recovered from Parks's body. He determined that the four .38-caliber bullets had been fired from the same gun. Schrand further determined that the four unfired .38 special cartridges that had been found near the shooting scene were similar to those found in the victim's body. Schrand analyzed the victim's hooded coat and several holes in the hood. He testified that one of the gunshots had been at close range, from less than a foot away.
Forensic pathologist Dr. Daniel Schultz testified that Parks had four gunshot wounds — two to his head, one to his arm, and one to his back. Dr. Schultz said that Parks had died from the two gunshot wounds to his head.
 II. Prosecutorial Misconduct
In his first and second assignments of error, Wilson claims that prosecutorial misconduct denied him his right to a fair trial. Wilson argues that he was prejudiced by the state's introduction of inadmissible hearsay and the state's reference to the hearsay during the trial, as well as during closing argument. Wilson also complains of several other instances of prosecutorial misconduct during opening statements, throughout the trial, and in closing argument — in each instance, the prosecutor referred to Donte Harris, a potential witness for the state. Though subpoenaed, Harris had failed to appear at Wilson's trial.
Generally, prosecutorial misconduct will not provide a basis for overturning a criminal conviction, unless, on the record as a whole, the misconduct can be said to have deprived the defendant of a fair trial.[1]
The test for whether prosecutorial misconduct mandates reversal is whether remarks or actions were improper, and, if so, whether they prejudicially affected the substantial rights of the accused.[2]
 A. Opening Statement
Wilson argues that, beginning with the opening statements, the prosecutors in this case laid the groundwork for their later introduction of inadmissible hearsay. The prosecutors told the jury that they had hoped to locate Donte Harris, whom they had subpoenaed to testify at trial. Wilson claims that the prosecutors "told the jury what [Donte Harris] would say if he appeared" to testify. Contrary to Wilson's assertion, however, the prosecutors did not tell the jury the likely content of Harris's testimony, but only referred to the fact that the police were looking for Harris so that he could testify regarding his statement to police.
Opening statements are not evidence and are intended only to advise the jury what counsel expects the evidence to show.[3] This court has held that a prosecutor did not engage in misconduct when he stated in voir dire and in opening statement that he intended to call a witness who later failed to appear at trial, where the prosecutor had subpoenaed the witness and had made substantial efforts to have the witness present for trial.[4]
In this case, Detective Darren Hoderlein testified that the police had attempted to procure Harris's appearance at trial by delivering numerous subpoenas to his home and by personally serving him with a subpoena. Also, a warrant had been issued for Harris's arrest. Detective Hoderlein created flyers and made notations in the police computer system, so that had Harris been stopped by any uniformed police officers, he would have been brought to the homicide unit. As Detective Hoderlein's testimony in the trial occurred on a Friday, he further stated that the efforts to locate Harris would continue throughout the weekend. On this record, we cannot say that the prosecutors in this case engaged in misconduct in opening statement, where the evidence demonstrated their substantial efforts to obtain Harris's appearance at trial.[5]
 B. Harris's Interview With Police
Wilson claims that the prosecutors improperly elicited inadmissible hearsay from Detective Hoderlein regarding his interview with Donte Harris. On direct examination, Detective Hoderlein said that he had interviewed Harris and that Harris had been cooperative. Detective Hoderlein testified that the tape-recorded interview lasted approximately twenty-three minutes, and that its transcription consisted of eighteen pages.
At one point, the prosecutor asked Detective Hoderlein, "Okay. And without telling me what Donte Harris said, did he identify who the shooter was?" Defense counsel objected, but the trial court overruled the objection. Detective Hoderlein responded, "Yes, he did." Detective Hoderlein then testified that, before his interview with Harris, the focus of his investigation had been upon Wilson. He further testified that, after his interview with Harris, Wilson remained the focus of his investigation.
The state argues that Hoderlein's testimony regarding Harris's statement to police contained no hearsay. "Hearsay" is defined in Evid.R. 801(C) as an out-of-court statement that is offered in evidence to prove the truth of the matter asserted. So if a statement is admitted to prove the truth of its contents, the statement is hearsay.[6]
We are not persuaded by the state's argument that Detective Hoderlein "did not repeat what Harris said in the interview." If that were true, the jury would not have known that Harris had identified the shooter. We see no problem with the detective's testimony to the effect that he had interviewed Harris, that the interview had lasted a certain amount of time, and that the interview had not changed the focus of his investigation. But there was a problem to the extent that the detective's testimony reflected the content of Harris's statement about who the shooter was. In effect, the prosecutor's question asked the detective to repeat a portion of the substance of Harris's statement.
We agree with Wilson that the detective's testimony regarding the fact that Harris had identified the shooter was inadmissible hearsay. While, on its own, the prosecutor's elicitation of the hearsay may not have been enough to establish prejudice, we must assess the prosecutor's conduct within the context of the entire trial, and more particularly the closing argument.[7]
 C. The Prosecution's Closing Argument
During closing argument, the prosecution addressed Harris's statement to police in the following manner:
 What do we know about Donte Harris? We know he was seen running from the murder scene. We know he's about six inches shorter than Marcus Wilson. And we know that on March fourth, two hours [sic] he turned himself into the police. And we know he gave a detailed, taped statement to police in which he identified the shooter.
 Now, you heard from Officer Hoderlein that prior to this interview Marcus Wilson was the focus of the investigation. Then during that interview, Donte identifies the shooter. And as a result of Donte's statement, Marcus Wilson continued to be the focus of the investigation and the prime suspect.
 What does that tell you? Not only that, but it's clear that the prosecutor's office and the Cincinnati Police have tried extremely hard to find Donte Harris and to bring him here to testify against Marcus Wilson. I think all of you know as you sit here today who it was that Donte Harris identified as the shooter.
 The evidence concerning Donte Harris pointed to Marcus Wilson, not Dwayne Cunningham. This case is not difficult. A brutal murder occurred and every type of evidence that there is points to Marcus Wilson.
 Wilson also complains that, in closing argument, the prosecutor improperly vouched for the credibility of the police during the following comments:
 Who was charged with murder by the police? In other words, who do the police think committed this murder? Police, as you know, charged Marcus Wilson, not Dwayne Cunningham.
 * * *Does it mean [the homicide officers] never make a mistake? No. But on the other hand, they are the cream of the crop of the Cincinnati Police Division. They have risen through the ranks to the most elite unit. And after a thorough, professional and unbiased investigation, they are convinced that it's Marcus Wilson[,] not Dwayne Cunningham. Believe me, if they thought Dwayne Cunningham did it, Dwayne Cunningham would be sitting here, not Marcus Wilson.
 Because Wilson did not object during the prosecutors' closing argument, he is precluded from predicating error on these alleged instances of misconduct, except to the extent that they reflect the tenor of the prosecutors' conduct throughout the entire trial.[8]
"In our adversarial system, prosecutors are not only permitted but also encouraged to argue fervently for conviction."[9] And in displaying that fervor in closing argument, the prosecution has wide latitude to argue as to what the evidence has shown and what reasonable inferences may be drawn from it.[10] But this latitude does not allow a prosecutor to invite the jury to reach its decision on matters outside the evidence adduced at trial.[11] Nor does it allow a prosecutor to allude to matters not supported by admissible evidence.[12]
We hold that the remarks in closing argument about Donte Harris's statement constituted improper conduct, because the statement was clearly inadmissible hearsay. The prosecutor offered the statement for the truth of the matter asserted, i.e., that Harris had identified the shooter.[13]
Moreover, we hold that, while the prosecutor's comments concerning the experience of the homicide officers may have been supported by the evidence, the prosecutor's act of personally vouching for the credibility of the state's witnesses "was an invasion on the province of the jury and was in direct violation of DR 7-106(C)(4) of the Code of Professional Responsibility. As such, it was clearly improper and constituted misconduct."[14]
Although the prosecutor's comments were improper, our analysis does not end there. We must determine whether the remarks were so prejudicial as to deny Wilson a fair trial.[15] To be prejudicial, "[t]he remarks must have `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[16] The improper conduct "should be assessed within the context of the entire case, and more particularly the entire closing argument to determine whether it was prejudicial."[17]
Our review of the record reveals that the prosecutor not only used Harris's statement to prove the truth of the matter asserted, but, in closing argument, the prosecutor used the statement in an attempt to persuade the jury that Harris had actually identified Wilson as the shooter. The prosecutor attempted to bolster the testimony of the state's witnesses with an insinuation that Harris's lengthy statement to police inculpated Wilson. After consideration of the prosecutor's conduct throughout the entire trial, we hold that the misconduct served to deprive Wilson of a fair trial. Therefore, we sustain Wilson's first and second assignments of error.
 III. Trial Court's Admission of Hearsay
In his third and fourth assignments of error, Wilson argues that the trial court erred by allowing the prosecution to introduce Harris's statement regarding the identity of the shooter. Unlike evidentiary rulings that are within the trial court's discretion, the admission of hearsay is reviewed under the harmless-error standard.[18] In determining that an error in the admission of evidence is harmless, we must conclude that there is no reasonable probability that the evidence may have contributed to the defendant's conviction.[19] Error in the admission of evidence cannot be harmless unless there is overwhelming other evidence establishing the defendant's guilt beyond a reasonable doubt.[20]
We agree with Wilson that his objection to the prosecutor's question regarding the identity of the shooter should have been sustained because it elicited inadmissible hearsay. In light of the lack of other overwhelming evidence in this case, we cannot say that the detective's testimony regarding Harris's statement did not contribute to Wilson's conviction. None of the witnesses to the shooting, Nichols, Green or Dudley, saw the face of the shooter. Two witnesses, Davis and McClain, had heard gunshots, looked out to see two people running from the scene, and thought that the taller person resembled Wilson. Another witness, Aisha Hedges, did not see the shooting, but saw Wilson and Harris running away from the scene.
Because we hold that the trial court should have sustained Wilson's objection to Hoderlein's testimony regarding Harris's identification of the shooter, we sustain Wilson's third assignment of error.
 IV. Juror's Communication Regarding State Witnesses
Wilson's sixth and seventh assignments of error address a juror's communication to the trial court. In his sixth assignment of error, Wilson argues that the trial court erred by failing to declare a mistrial after a juror revealed that she had seen some of the state's witnesses speaking about the case. The trial court excused the juror after she said that her experience had affected her judgment of the credibility of those witnesses. Wilson claims that the trial court should have sua sponte
declared a mistrial based upon the juror's revelations.
Shortly after the jury had begun deliberating, one of the jurors, Mary Taylor, informed the court that, six days earlier, she had seen some of the state's witnesses talking about the trial. Outside the presence of the other jurors, the court informed the prosecution and defense counsel about the communication. At that time, the parties agreed that the court should order the jury to cease deliberations. Then, the court placed Juror Taylor under oath and questioned her about the communication.
Juror Taylor told the court that, while riding on a bus, she had overheard three of the state's witnesses discussing their testimony in the case. She indicated that, when she began to raise the issue with the other jurors, they immediately told her that she "shouldn't say anything like that," and that she was "supposed to tell that to the judge." Juror Taylor said, "I didn't talk to them about this because I caught myself at the time and someone say [sic] I have to see the judge. I said, I'm not aware that I was supposed to talk to the Judge about this, I said."
The court asked Juror Taylor whether she recalled its instruction to the effect that should a juror acquire information about the case from an outside source, he or she was to report it to the court. When the court asked Juror Taylor whether the experience had affected her view of the credibility of those witnesses, she responded, "I think it did." Following its discussion with the juror, the court concluded that Juror Taylor could not continue to be fair and impartial in the case and released her from her jury service.
The court indicated to counsel that it was inclined to declare a mistrial based upon Juror Taylor's comments. But counsel for both the state and the defense requested that the court allow them time to discuss, as an alternative to a mistrial, the possibility of proceeding with the remaining eleven jurors.
The court then brought the remaining jurors into the courtroom and informed them that Juror Taylor had been excused and that the court was considering how to proceed. The court asked the foreperson of the jury about Juror Taylor's comments regarding the note she had written to the court. The foreperson told the court that Juror Taylor said that she had been on a bus and that she had overheard three witnesses "talking about their relation to an individual." At that time, the jurors "told her to stop talking about that at that time." The court asked whether Juror Taylor had talked any further about her experience, and the foreperson responded, "No, no. We made sure — * * * We asked her not to discuss that anymore, again, because we weren't sure what to do at that point. So we instructed her not to discuss it anymore, and then that's when we decided to contact the bailiff."
The court excused the jurors for the evening and admonished them that, upon their return the following morning, they were not to continue their deliberations until instructed to do so. The next morning, the court learned that another juror, Mr. Scherer, had told the bailiff about the comments made by Juror Taylor. With the agreement of counsel, the court questioned Juror Scherer outside the presence of the other jurors. The juror told the court that Juror Taylor "was very defiant in everything that we tried to do. We naturally tried to include everybody in here. And the only words that she would say, I'll never believe anything that a police officer says. They are all liars. And one of us * * * said, well, Mary, when they asked us, the lawyers asked us on different questions how we feel about officers, can we believe their testimony, believe it over other testimony, or whatever, you said that you had no problem. You can listen to everybody's testimony and everything would be fine."
When the court asked the juror whether he believed that he could still be fair and impartial despite what Juror Taylor had said, the juror responded, "Yes, sir, I do. None of us have any idea what she said or what was told to her on that bus. When she brought this up, she brought the conversation up more or less, I [rode] the bus with these three girls and they started talking about — and one of the people said — interrupted and said, Mary, we are not allowed to hear this." When the jurors told Juror Taylor to report her experience to the court, she responded, "I don't have to tell anybody anything. * * * The very minute we went in there [to begin deliberations] she got very belligerent and defiant and very anti-law."
Counsel for the prosecution and the defense declined to ask further questions of the juror. The court instructed Juror Scherer not to discuss with the rest of the jurors the conversation he had had with the court and counsel. At that time, the entire jury was brought into the courtroom. The court polled each juror as to whether he or she could remain fair and impartial in deciding the case in light of the comments made by Juror Taylor. Each of the eleven jurors responded affirmatively.
The court excused the jury again and discussed with counsel their decision to proceed with the case. One of Wilson's defense attorneys advised the court,
 I speak on behalf of Marcus Wilson, Rodney Harris, co-counsel, and other members of Marcus' family who we've talked to, and we are unanimous in our feeling that we are willing to go ahead and permit the remaining eleven members of the jury to deliberate this case to a verdict.
 We recognize the rule mandating twelve jurors in a felony case; however, myself, Mr. Harris, Marcus, his grandmother, his grandfather, and other family members are agreeable and are asking the Court to permit this jury to deliberate to a verdict with the eleven members remaining.
 And, in addition, we've discussed the issue that the Court just addressed to the jurors about today and yesterday at the end of the day regarding Miss Taylor, the excused juror, we're all unanimous. And, again, asking the Court to — we are satisfied with the jury. We are asking the Court to allow them to deliberate this case to a verdict.
 And we've talked to the family and Marcus about it. Marcus is a juvenile, so we've included his family in this decision process. Is that correct, Marcus?
THE DEFENDANT: Yes, sir.
DEFENSE COUNSEL: Is that your feeling?
THE DEFENDANT: Yes, sir.
At that point, the court allowed the remaining eleven jurors to continue their deliberations. Wilson now complains that the court should have declared a mistrial. Yet Wilson did not move for a mistrial. In fact, Wilson informed the court that, after due consideration, he wanted deliberations to proceed with the remaining jurors. Had the trial court declared a mistrial over Wilson's objection, its decision may have triggered a double-jeopardy violation.
A trial court's declaration of a mistrial, over a defendant's objection, may bar retrial of the defendant where there is no manifest necessity for the mistrial.[21] "At least some effort on the part of the trial court to explore alternatives must be apparent before a high degree of necessity is demonstrated."[22]
In U.S. v. Toribio-Lugo,[23] twelve jurors and one alternate were selected to serve in the defendant's case, but, due to confusion during the process, one of the jurors was not seated in the jury box. The trial actually began with eleven jurors and the alternate. No one noticed that a juror was missing. On the second day of trial, the alternate juror asked to be excused for personal reasons, and neither side objected. The court, under the mistaken belief that twelve jurors remained, excused the alternate juror. On the fourth day of trial, the courtroom deputy for the first time pointed out to the court that one of the jurors was missing.
The court asked both parties to consent to proceeding with only eleven jurors, but the defendant refused. Seeing that no other option remained since the lost juror had missed at least two days of testimony, the court declared a mistrial. The defendant withheld his consent to proceed with eleven jurors, but then claimed that there was no manifest necessity to declare a mistrial. The court held, "Defendant cannot have it both ways. There was nothing left for the Court to consider. * * * Therefore, absent the Defendant's consent, the Court had a manifest necessity to declare a mistrial sua sponte, and as such, the Double Jeopardy Clause does not bar retrial."
In this case, not only did Wilson fail to move for a mistrial, but when the court indicated its inclination to declare a mistrial, he specifically asked the court to forego that option and to proceed with the remaining eleven jurors. Wilson cannot now complain that the trial court should have ignored his request to allow the trial to proceed. Moreover, the trial court went to great lengths to ensure that the remaining jurors had not been tainted by Juror Taylor's comments and that they could remain fair and impartial in the case. Therefore, we cannot say that the trial court erred by failing to declare a mistrial on its own motion. Wilson's sixth assignment of error is overruled.
In his seventh assignment of error, Wilson claims that the trial court should have granted his motion for a new trial. Wilson contends that a new trial was warranted due to the alleged misconduct of the state's witnesses.
The decision whether to grant a motion for a new trial rests in the sound discretion of the trial court.[24] Wilson's motion was based upon Juror Taylor's assertions about state's witnesses. In response to Wilson's motion, the state filed affidavits of the witnesses involved that contradicted Juror Taylor's assertions. Given our conclusions regarding Wilson's sixth assignment of error, and the court's consideration of contrary affidavits, we cannot say that the trial court abused its discretion by overruling Wilson's motion for a new trial. Therefore, we overrule Wilson's seventh assignment of error.
 V. Eleven Jurors
In his eighth assignment of error, Wilson argues that the trial court erred by failing to order a mistrial and by proceeding with eleven jurors without first obtaining a written jury waiver. In his ninth assignment of error, Wilson argues that the trial court erred by overruling his motion for a new trial based on the absence of a written jury waiver. We address both assignments together.
In 1921, the Supreme Court of Ohio recognized a defendant's ability to waive his right to a twelve-person jury:
 Sections 5 and 10 of the Ohio Bill of Rights confer upon persons accused of crime a right of trial by jury, but this right may be waived, and accused persons may, with the approval of the court, consent to be tried by a jury composed of less than twelve men.
 The provisions of those sections are not peremptory or mandatory in form, and although the legislature may not enact any law taking away from persons accused of crime the right or privilege of jury trial, and although courts may not authoritatively try such persons otherwise than before a constitutional jury of twelve men, such persons may with the assent of the court voluntarily waive such right, and after conviction will be estopped from prosecuting error therefrom.[25]
 The Sixth District Court of Appeals has held that a "defendant, charged with crime, or his counsel in his presence, may waive trial by jury of twelve persons, and defendant, consenting to such waiver, cannot be heard to deny that he was tried by a jury lawfully constituted."[26]
The United States Supreme Court has held that the constitutional right to a trial by jury does not necessarily require a trial by a twelve-person jury.[27] The Court noted that, at common law, the number came to be fixed at twelve, by way of "historical accident, unrelated to the great purposes which gave rise to the jury in the first place.[28]
In Ohio, Crim.R. 23(B) provides that, in felony cases, "juries shall consist of twelve." While in most cases a trial court has a legal duty to comply with the literal language of the rule, the rule is not absolute.[29] Crim.R. 23(B) "is a procedural right that merely prescribes the method by which the substantive right to a jury is to be exercised."[30]
In a criminal case, where a defendant elects to waive his constitutional right to a jury trial, that waiver must be in writing, signed by the defendant, and made a part of the record.[31] But, given that the number of jurors is not a constitutional right,[32] a defendant may consent to be tried before fewer than twelve jurors without the execution of a written waiver.[33] In this case, after consultation with defense counsel and his family members, Wilson asked the trial court to proceed with a diminished jury. We cannot say that the trial court erred by proceeding as Wilson requested. Therefore, we overrule his eighth and ninth assignments of error.
 VI. Sufficiency of the Evidence
Because we sustain Wilson's claims of prosecutorial misconduct and of error in the trial court's admission of hearsay, we must reverse his conviction and remand the case to the trial court. But, before doing so, we must also address Wilson's claim concerning the sufficiency of the evidence, because should we sustain that claim of error, the state would be barred from retrying Wilson.[34]
A review of the sufficiency-of-the-evidence claim requires us to determine whether the evidence, viewed in a light most favorable to the state, could have convinced any rational trier of fact, beyond a reasonable doubt, that Wilson had purposely, and with prior calculation and design, caused the death of Christopher Parks.[35]
Wilson argues that there was "no eyewitness evidence of the identity of the perpetrator; there is no admission of guilt by the accused; and there is no physical evidence which points to [him] to the exclusion of all others as the person who shot Parks to death." But the record demonstrates otherwise.
Several witnesses saw the actual shooting and gave descriptions of the shooter to police. Sharon Davis, who knew Wilson, testified that she thought Wilson was one of the two people who had approached the victim, and that moments later she heard a gunshot and saw the two people running away, toward Zinsle Avenue. Melanie McClain testified that, after hearing gunshots, she saw two people who matched the physical characteristics of Wilson and Harris. She, too, saw the pair running toward the home of Aisha Hedges, on Zinsle Avenue. The day before the shooting, she had heard Wilson say that he had been robbed and that he was going to get back at Christopher Parks. Aisha Hedges testified that, upon hearing gunshots, she saw Wilson and Harris jogging down Zinsle Avenue toward her house. Her description of the pair's clothing matched those of the other witnesses.
On review for sufficiency, "the weight and credibility of the evidence are left to the trier of fact."[36] A sufficiency inquiry does not require a reviewing court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt."[37]
We hold, therefore, that the state presented evidence that was sufficient, if believed, to show that Wilson had shot Parks to death. Accordingly, we overrule Wilson's tenth assignment of error.
 VII. Conclusion
Because we sustain Wilson's prosecutorial-misconduct claims, as well as his claims of error in the admission of hearsay, his conviction must be reversed and the case remanded for new trial. Furthermore, we have rejected Wilson's claims of insufficient evidence, of the court's failure to declare a mistrial or order a new trial, and of proceeding with fewer than twelve jurors. We do not need to address Wilson's remaining claims.
Therefore, we reverse the trial court's judgment and remand this cause for further proceedings consistent with law and this Opinion.
Judgment reversed and cause remanded.
Doan, P.J., and Gorman, J., concur.
[1] See State v. Lott (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293,301, certiorari denied (1990), 498 U.S. 1017, 111 S.Ct. 591; State v.Maurer (1984), 15 Ohio St.3d 239, 266, 473 N.E.2d 768, 793; State v.Alfieri (1998), 132 Ohio App.3d 69, 724 N.E.2d 477, discretionary appeal not allowed (1999), 85 Ohio St.3d 1477, 709 N.E.2d 849.
[2] See State v. Lott, supra, at 165, 555 N.E.2d at 300; State v.Smith (1984), 14 Ohio St.3d 13, 470 N.E.2d 883; State v. Smith (2000),87 Ohio St.3d 424, 442, 721 N.E.2d 93, 112; State v. Hart (1994),94 Ohio App.3d 665, 641 N.E.2d 755, discretionary appeal not allowed (1994), 70 Ohio St.3d 1446, 639 N.E.2d 114.
[3] See State v. Johnson (Sept. 25, 1996), Hamilton App. No. C-950493, unreported.
[4] State v. Larkin (Aug. 17, 2001), Hamilton App. No. C-000572, unreported, discretionary appeal not allowed (2001), 93 Ohio St.3d 1486,758 N.E.2d 186.
[5] See Johnson, supra.
[6] State v. Williams (1988), 38 Ohio St.3d 346, 348, 528 N.E.2d 910,914.
[7] State v. Keenan (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203,209.
[8] See State v. Keenan (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203,209; State v. Rolley (Sept. 24, 1999), Hamilton App. No. C-980555, unreported, discretionary appeal not allowed (2000), 87 Ohio St.3d 1490,722 N.E.2d 524.
[9] State v. Hart, supra, at 671, 641 N.E.2d at 759.
[10] See id.
[11] See id at 672, 641 N.E.2d at 759.
[12] See State v. Lott, supra, at 166, 555 N.E.2d at 300.
[13] See State v. Williams, supra, at 348, 528 N.E.2d at 914.
[14] State v. Alfieri, supra, at 85, 724 N.E.2d at 487.
[15] See State v. Willard (2001), 144 Ohio App.3d 767,761 N.E.2d 688.
[16] See State v. Hart, supra, at 676, 641 N.E.2d at 761, citingDonnelly v. DeChristoforo (1974), 416 U.S. 637, 643, 94 S.Ct. 1868,1871.
[17] Id.
[18] See State v. Sutorius (1997), 122 Ohio App.3d 1, 7, 701 N.E.2d 1,5, discretionary appeal not allowed (1997), 80 Ohio St.3d 1424,685 N.E.2d 237, citing State v. Sorrels (1991), 71 Ohio App.3d 162, 165,593 N.E.2d 313, 315; State v. Wedge (Dec. 21, 2001), Hamilton App. No. C-000747, unreported.
[19] See Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824; Statev. Bayless (1976), 48 Ohio St.2d 73, 357 N.E.2d 1035, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3135.
[20] State v. Williams (1983), 6 Ohio St.3d 281, 452 N.E.2d 1323, syllabus.
[21] See State v. Douthard (June 29, 2001), Hamilton App. Nos. C-000354 and C-000355, unreported, discretionary appeal not allowed (2001),93 Ohio St.3d 1459, 756 N.E.2d 1235, citing Arizona v. Washington
(1978), 434 U.S. 497, 98 S.Ct. 824.
[22] Id., citing Glover v. McMackin (C.A.6, 1991), 950 F.2d 1236.
[23] (P.R. 2001), 164 F. Supp.2d 251.
[24] State v. Scheibel (1990), 55 Ohio St.3d 71, 564 N.E.2d 54.
[25] State v. Baer (1921), 103 Ohio St. 585, 134 N.E. 786, syllabus.
[26] Easler v. State (1927), 25 Ohio App. 273, 157 N.E. 813.
[27] See Williams v. Florida (1970), 399 U.S. 78, 86,90 S.Ct. 1893, 1898.
[28] Id. at 89-90, 90 S.Ct. at 1900.
[29] See State v. Thomas (1980), 61 Ohio St.2d 223, 225, 400 N.E.2d 401,403.
[30] Zanesville v. Spinks (Oct. 14, 1994), Muskingham App. No. 94-17, unreported, citing State, ex rel. Columbus v. Boyland (1979),58 Ohio St.2d 490, 492-493, 391 N.E.2d 324, 326; State v. Girts (1997),121 Ohio App.3d 539, 557, 700 N.E.2d 395, 407.
[31] State v. Pless (1996), 74 Ohio St.3d 333, 658 N.E.2d 766.
[32] Girts, supra, at 558, 700 N.E.2d at 407, citing State ex rel.Columbus v. Boyland, supra, at 492-493, 391 N.E.2d at 326.
[33] See State v. McCombs (Dec. 14, 2000), Marion App. No. 9-2000-66, unreported (where a defendant elected to waive his right to a twelve-person jury after being questioned by the court and advised by defense counsel, it was not plain error for the trial court to proceed with an eleven-member jury); see, also, State v. Askerneese (Dec. 6, 2000), Jefferson App. No. 99-JE-23, unreported; State v. Brooks (Mar. 30, 2000), Cuyahoga App. Nos. 75711 and 75712, unreported; State v.Capan (Apr. 15, 1995), Summit App. No. 16892, unreported, discretionary appeal not allowed (1995), 73 Ohio St.3d 1449, 654 N.E.2d 986.
[34] See State v. Freeman (2000), 138 Ohio App.3d 408, 424,741 N.E.2d 566, 576, citing State v. Thompkins (1997), 78 Ohio St.3d 380,387, 678 N.E.2d 541, 547.
[35] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[36] State v. Herring (2002), 94 Ohio St.3d 246, 253, 762 N.E.2d 940,950, citing State v. Waddy (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819,825.
[37] Id., citing Jackson v. Virginia (1979), 443 U.S. 307, 318-319,99 S.Ct. 2781, 2789.