**Terence Chadwick LAWRENCE, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

No. 05–05–01391–CR.

Court of Appeals of Texas, Dallas.

Dec. 27, 2006.

John G. Tatum, Richardson, for Appellant.

William T. (Bill) Hill, Jr., Crim. Dist. Atty., Amy Sue Melo Murphy, Dallas, for State.

Before Justices MORRIS, WHITTINGTON, and RICHTER.

## OPINION

Opinion by Justice WHITTINGTON.

Terence Chadwick Lawrence appeals his conviction for the capital murder of Antwonyia Smith. After finding appellant guilty and that he used or exhibited a deadly weapon during the commission of the offense, the jury assessed punishment at life confinement. In six issues, appellant claims the evidence is legally and factually insufficient to support his conviction, the trial judge erred in denying his motion to quash the indictment, and the capital

murder statute is unconstitutional. We affirm the trial court's judgment.

### Legal and Factual Sufficiency of the Evidence

In his third, fourth, fifth, and sixth issues, appellant claims the evidence is legally and factually insufficient to support his conviction. Appellant argues the State failed to present sufficient evidence to prove appellant shot Smith and that Smith's fetus was alive at the time of Smith's murder. We disagree.

■ When reviewing challenges to the legal sufficiency of the evidence, we apply well-established standards. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Garcia v. State*, 57 S.W.3d 436, 441 (Tex.Crim.App. 2001). The standard is the same for both direct and circumstantial evidence cases. *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex. Crim.App.1999). We view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim.App.2005); *Escamilla v. State*, 143 S.W.3d 814, 817 (Tex.Crim.App.2004), *cert. denied*, 544 U.S. 950, 125 S.Ct. 1697, 161 L.Ed.2d 528 (2005); *Simmons v. State*, 109 S.W.3d 469, 472 (Tex.Crim.App.2003). The jury, as sole judge of the witnesses' credibility and the weight to be given their testimony, is free to accept or reject any or all of the evidence presented by either side. *See Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App.2000); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex.Crim.App. 2000). In circumstantial evidence cases such as this one, it is unnecessary for every fact to point directly and independently to appellant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *See Johnson v. State*, 871 S.W.2d 183, 186 (Tex.Crim. App.1993) (citing *Russell v. State*, 665 S.W.2d 771, 776 (Tex.Crim.App.1983)). Circumstantial evidence, by itself, may be enough to support the jury's verdict. *See Smith v. State*, 965 S.W.2d 509, 515–16 (Tex.Crim.App.1998).

In a factual sufficiency review, we view all of the evidence in a neutral light and ask whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 415 (Tex.Crim.App.2006). To reverse a case on a factual sufficiency challenge, we must be able to say, with some objective basis in the record, that the great weight and preponderance of evidence contradicts the jury's verdict. *Watson*, 204 S.W.3d at 417. We cannot conclude a conviction is "clearly wrong" or "manifestly unjust" simply because we would have voted to acquit. *Watson*, 204 S.W.3d at 417. In examining a factual sufficiency challenge, although the reviewing court is permitted "to substitute its judgment for the jury's" when considering credibility and weight determinations, it may do so only "'to a very limited degree.'" *Marshall v. State*, 2006 WL 3733198, \*5 (Tex.Crim.App. Dec.20, 2006) (citing *Watson*, 204 S.W.3d at 417).

■ A person commits capital murder if he intentionally or knowingly causes the death of an individual and he murders more than one person during the same criminal transaction. TEX. PEN.CODE ANN. §§ 19.02(b)(1), 19.03(a)(7)(A) (Vernon 2003 & Supp.2006). A "person" includes "an individual." TEX. PEN.CODE ANN. § 1.07(a)(38) (Vernon Supp.2006). An "individual" is "a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth." TEX. PEN.CODE ANN. § 1.07(a)(26) (Vernon Supp.2006).

At trial, Detective John Davison testified that, around 7:00 a.m. on Thursday, September 9, 2004, he was called to the 3700 block of Boulder Street in Dallas to investigate a murder. The victim, identified as Smith, was lying in the Sprague Swimming Pool parking lot of Kimball High School. She had been shot three times with a shotgun. No weapon was discovered at the scene, but two spent shotgun shell casings were found as was Smith's cell phone. The police received information that appellant was dating Smith and another woman named Courtney Anderson at the time of Smith's death. Appellant also had a friend named Kenneth Moore who lived near the scene of the crime. Acting on this information, Detective Davison interviewed Anderson and Moore.

Detective Davison testified Anderson gave a written statement. Anderson confirmed that she and appellant were boyfriend and girlfriend and that appellant had been seeing Smith as well. According to Anderson, Smith called Anderson's house, wanting to talk to appellant and to tell him she was pregnant. When Anderson told appellant Smith had called, he said "he was going to take care of the problem." Anderson asked appellant what he meant by that, and he said if she did not know, she did not need to worry about it. Anderson told Detective Davison appellant was with her on the night of September 8th, the night before Smith's body was discovered, until he left around midnight, and he called her about two hours after he left her house.

Detective Davison interviewed Moore who also gave a written statement. Moore stated appellant left his shotgun and a box of shells at Moore's house and picked them up a few days before Smith's death. In light of this information, the investigating officers obtained search warrants for appellant's house and the car appellant drove. Under the rear seat of appellant's vehicle, police found a spent shotgun shell casing. The officers interviewed appellant who told them he bought a "20 gauge pump shotgun" in late July 2004 but that it had been stolen from the car, along with a CD player. Appellant told Detective Davison he did not report the theft. He also stated that, on the night before Smith's body was discovered, he left Anderson's house and was home by midnight. He "stayed at home and talked on the phone" with Anderson.

The police ran tests on the three spent shotgun shell casings and subsequently arrested appellant. After examining Smith's cell phone, police also discovered Smith received a call around 1:00 a.m. on September 9th. Although police could not view the phone number from her cell phone caller ID because it had been blocked, they were able to trace the call to Moore's house. Acting on this information, Detective Davison returned to Moore's house and interviewed him a second time. Detective Davison told Moore his phone number showed up when the police traced the last call Smith received on her cell phone and that he believed Moore had not been truthful when he gave his previous statement. Moore admitted he had not told the truth about the shotgun, stating he wanted to help appellant. Moore then told Detective Davison that appellant retrieved the shotgun and the box of shells from Moore's house around midnight on September 8th. Moore was in bed at the time but got up to show appellant where the shotgun was. He later heard appellant using the phone at the Moore residence before leaving. Moore's phone had a feature (known as " *67") that allows a caller to block transmission of the phone number when making a call.

Detective Davison conceded police did not find the shotgun used in Smith's mur-

der. No evidence of blood spatter was found on appellant's car or at his house. Because police did not establish a relationship between Smith and Moore, they did not search Moore's house for evidence.

Moore, a senior at Kimball High School, testified he was a freshman when he met appellant. The two played basketball together "every day" during the summer of 2004. Moore knew Smith through appellant but did not know much about their relationship. Moore also knew appellant dated Anderson. Appellant often came by Moore's house, and it was not uncommon for him to drop by late at night, for example, around midnight or 1:00 a.m. At some point, appellant took a shotgun and a box of shells to Moore's house and asked Moore to keep them for him. Appellant said his car had a broken tail light; if he was stopped by the police, he did not want them to find the gun. Moore put the shotgun and shells in his closet. On September 8, 2004, appellant dropped by Moore's house around midnight to retrieve the gun. Moore had already gone to bed. When appellant got there, Moore got up and showed appellant where the gun was located. Appellant took the shotgun and shells and walked out of Moore's bedroom. Moore thought appellant had left the house, but he then heard appellant talking on Moore's home phone. Moore could not distinguish what appellant was saying on the phone. Moore testified his home phone had the *67 feature, allowing the caller to block the phone number from the view of the person receiving the call.

The following day, Moore learned of Smith's murder. When he asked appellant about it, appellant said "he didn't do it and he didn't know nothing about it." He then told Moore he was at Anderson's house and "if anybody said anything, that's where he was." During Moore's first interview with police, they asked when appel-

lant retrieved the shotgun and shells from Moore's house. Moore admitted he had not been honest with police when he told them appellant stopped by several days before Smith's death. He stated he did not "want to be known as somebody who was ratting out his buddy" nor did he want to be the one who got appellant in trouble. He also testified that, the day Smith's body was discovered, he told Anderson about appellant coming by his house and getting the shotgun the night before. Moore admitted that, when police interviewed him a second time, they told him about tracing the phone call from his house to Smith's cell phone.

Anderson testified she dated appellant during the 2003–04 school year, but they broke up in May 2004. During that summer, she continued to see appellant "periodically during the week" because she still had strong feelings for him. She knew of Smith but had not met her until Smith showed up at her house one day, wanting to talk to Anderson about appellant. After their conversation, Anderson asked appellant if he and Smith were dating. Appellant said he had not talked to Smith but admitted they had dated previously. Later, Smith began calling Anderson at home. Sometimes she wanted to talk to Anderson, other times to appellant. At some point, Anderson asked appellant if Smith was pregnant with his child; he answered, "no." On the night of September 8th, appellant visited Anderson at her house around midnight. He stayed about thirty minutes, leaving between 12:15 or 12:30 a.m. Anderson testified Moore called her around 1:00 a.m. to tell her that appellant got the shotgun from Moore's house. She testified Moore did not mention any shotgun shells. Appellant then called her around 1:50 a.m., and they "had a normal conversation." She conceded she told Detective Davison that Smith called her on the Monday night before Smith's death to

tell her she was pregnant by appellant. Anderson also conceded appellant told her he was going to take care of the problem but denied that she asked him what that meant and denied that he told her if she did not know, she did not need to worry. Anderson admitted she continued to have a relationship with appellant and that she has spoken with him regularly since Smith's death.

Carl Oden, manager of Uncle Dan's pawn shop, testified that, on August 24, 2004, he sold a "Nato Gamebird 10, 20 gauge shotgun" to appellant. Oden was not very familiar with this type of shotgun and had not seen many. He testified he would characterize it as a deadly weapon.

Edward Glantz testified that, on the night of September 8, 2004, he visited his friend Kevin, who lived in the area near Kimball High School where Smith's body was found. Around 1:30 a.m., Kevin suggested they go outside so he could smoke. The men were sitting on the tailgate of Kevin's truck when they heard a scream, followed by a "boom, big old gunshot, sounded like a shotgun." Glantz then heard another scream which sounded like "Help" and two more gunshots. Glantz looked at his cell phone and told Kevin, "Hey, something bad happened tonight, you know, remember that [it happened at] 1:43." They waited about ten minutes, then got in the truck and drove around the area opposite of where Smith's body was discovered the following morning. They did not go near the Sprague swimming pool parking lot, and they did not see anything.

Lannie Emanuel, a firearm and toolmark examiner for the Southwestern Institute of Forensic Sciences (SWIFS), testified Charles Clow, another firearm and toolmark examiner with SWIFS, tested the three 20 gauge Winchester Super Speed shotgun shell casings, two of which

were found at the scene, and the third of which was found under appellant's rear car seat. Clow determined the three casings had sufficient individual characteristics to identify them as having been fired from the same firearm.

Lynn Salzberger, a medical examiner with SWIFS, testified she performed Smith's autopsy. Smith was shot three times, all at "fairly close range." Salzberger first discussed the shotgun blast to the face which she described as "a devastating wound. The pellets from the shotgun went into her brain." The second wound was also at fairly close range and was to the right side of the upper chest. The pellets from this shot went into the body and injured the ribs, thymus, diaphragm, lungs, and aorta. The third wound was to the right side of Smith's back which injured her ribs, right kidney, adrenal gland, right lung, esophagus, aorta, and the right side of the diaphragm and liver. Salzberger testified that each of the three shots inflicted fatal injuries, and Smith could have died from any one of the three shots fired. She opined that, because there was less bleeding as a result of the shot to the face, it was likely the last shot fired.

Salzberger testified Smith was pregnant at the time of her death. During the autopsy, Salzberger located an amniotic sac with a small placenta disk. The embryo inside the sac was approximately one-half centimeter long. Salzberger estimated the embryo to be four to six weeks old. The amniotic fluid was clear, indicating a healthy pregnancy. Salzberger testified that if the embryo had already been dead or dying, the tissue would have started to decompose, and that decomposing tissue looks different than live tissue. The fact that Smith's embryo did not appear to be in a state of decomposition indicated the embryo was alive at the time of Smith's death. Salzberger testified that the em-

bryo was not able to survive on its own; the embryo would have died when Smith died. Salzberger examined Smith's Methodist Hospital medical records. Salzberger testified that, according to the records, Smith presented at the hospital on September 5, 2004, with abdominal pain. She underwent tests, including a pelvic sonogram, which confirmed she was approximately five weeks pregnant.

In contrast to the above evidence and testimony, appellant testified that, after he bought the shotgun and shells on August 24, 2004, he kept them under the back seat of his car. He denied giving the gun and shells to Moore for safekeeping, saying he "never had a busted tail light." According to appellant, he bought the shotgun and shells because he had been "jumped" by some gang members during the previous February in Kiest Park. He had not seen them at the park for some time but they showed up later in the year, prompting appellant to buy the shotgun for protection. He had the shotgun approximately seven days before it was stolen, along with his CD player, from his car. One night, appellant left the passenger side door unlocked; the following morning, he discovered the CD player, shotgun, and shells were gone. He did not report the crime to the police because he knew they would not be able to recover the items. Appellant stated Smith told him in July she thought she might be pregnant. He denied shooting Smith and testified he had no problem with Smith's being pregnant. He claimed that when he told Anderson he was going to take care of the problem, he meant he was going to find out if he was the father. Appellant later conceded he was jumped by the gang in early January 2004, not February.

Viewed in the light most favorable to the judgment, the evidence shows appellant had been seeing both Anderson and Smith during the summer of 2004. In July, Smith told appellant she might be pregnant. During late August, Smith began calling Anderson, often to talk to appellant. On August 24, appellant bought a shotgun and a box of shells which he kept under the back rear seat of his car. Shortly thereafter, appellant asked Moore if he could keep the gun and shells for appellant. Moore did so. On September 5, 2004, Smith went to the hospital complaining of abdominal pain. Tests confirmed she was pregnant. The following day, Smith called and told Anderson she was pregnant by appellant. Appellant knew Smith was pregnant and told Anderson he was going to take care of the problem. On the night of September 8, 2004, appellant visited Anderson briefly, leaving around 12:15 or 12:30 a.m. He retrieved the shotgun and shells from Moore's house and placed a call from Moore's home phone to Smith on her cell phone. Later, witnesses heard three gunshot blasts and screams in the area around Kimball High School. Early in the morning of September 9, 2004, Smith's body was found in the Sprague Swimming Pool parking lot near Kimball High School with three shotgun wounds. Smith, who died as a result of the three shots, was pregnant at the time of her death. The embryo showed no signs of decomposition, indicating the pregnancy was normal and that the embryo was alive prior to Smith's death. Tests on the two shotgun shell casings found near Smith's body and the one shotgun shell casing found under the back seat of appellant's car confirmed they were fired from the same gun. From these facts, we conclude a rational jury could infer appellant intentionally or knowingly caused Smith's death and murdered Smith's unborn child during the same criminal transaction. *See* TEX. PEN.CODE ANN. §§ 19.02(b)(1), 19.03(a)(7)(A). After viewing the evidence in the light most

favorable to the verdict, we conclude the evidence is legally sufficient to support appellant's conviction for capital murder. We overrule appellant's third and fifth issues.

In his fourth and sixth issues, appellant raises the same argument to challenge the factual sufficiency of the evidence. Furthermore, we cannot conclude, after reviewing all the evidence in this case, that the great weight and preponderance of evidence contradicts the jury's verdict. *See Watson*, 204 S.W.3d at 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App. 2000). Because the jury was rationally justified in finding guilt beyond a reasonable doubt, we conclude the evidence is factually sufficient to support appellant's conviction. *See Watson*, 204 S.W.3d at 417. We overrule appellant's fourth and sixth issues.

### Constitutionality of Statute

■ In his second issue, appellant contends the definition of an individual, i.e., a "human being who is alive, including an unborn child at every stage of gestation from fertilization until birth," is unconstitutional under the Fourteenth Amendment to the United States Constitution because it is vague and fails to provide fair notice to an individual, specifically appellant, that his alleged activity was proscribed by section 19.03(a)(7)(A) of the penal code. Appellant further argues the definition is unconstitutional because it fails to distinguish between viable and nonviable fetuses. *See Roe v. Wade*, 410 U.S. 113, 160–65, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

■ When we review a challenge to the constitutionality of a statute, we begin with the presumption that the statute is valid and the legislature did not act unreasonably or arbitrarily in enacting it. *Ex parte Granviel*, 561 S.W.2d 503, 511 (Tex. Crim.App.1978). The party challenging the constitutionality of a statute bears the burden of proving the challenged statute is unconstitutional. *Ex parte Granviel*, 561 S.W.2d at 511. We will uphold a statute if it can be reasonably construed in a manner that will render it constitutional. *Ex parte Granviel*, 561 S.W.2d at 511; *Ely v. State*, 582 S.W.2d 416, 419 (Tex.Crim.App. [Panel Op.] 1979).

■ When First Amendment rights are not implicated, a criminal statute is unconstitutionally vague when it fails to (i) give a person of ordinary intelligence reasonable notice of what is prohibited or required and (ii) establish determinate guidelines for law enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Long v. State*, 931 S.W.2d 285, 287 (Tex.Crim. App.1996). Thus, a statute is void for vagueness if its prohibitions are not clearly defined. *State v. Holcombe*, 187 S.W.3d 496, 499 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 127 S.Ct. 176, 166 L.Ed.2d 41 (2006); *State v. Markovich*, 77 S.W.3d 274, 279 (Tex.Crim.App.2002). We uphold a vagueness challenge only if the statute is impermissibly vague in all its applications. *Holcombe*, 187 S.W.3d at 499 (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)).

The penal code provides that a person commits the offense of capital murder if he (i) intentionally or knowingly causes the death of an individual and (ii) murders more than one person during the same criminal transaction. TEX. PEN.CODE ANN. §§ 19.02(b)(1), 19.03(a)(7)(A). An individual is "a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth." TEX. PEN. CODE ANN. § 1.07(a)(26). The statute clearly prohibits the murder of an individual and clearly prohibits murdering more than one person during the same criminal

transaction. It gives reasonable notice such behavior is forbidden. The statute defines an "individual" as a living human being, including a fetus. The statute clearly states a fetus is an individual from the moment of fertilization, placing no limitation on the stage of development of the fetus. The plain language of the statute provides notice to ordinary persons that the intentional or knowing murder of a pregnant woman and her unborn child is forbidden. *See State v. Merrill,* 450 N.W.2d 318, 324 (Minn.1990) (concluding statute imposing criminal penalty for person causing death of "unborn offspring of a human being conceived, but not yet born" not "vaguely defined"); *State v. Alfieri,* 132 Ohio App.3d 69, 724 N.E.2d 477, 483 (1998) (concluding statute proscribing "unlawful termination of another's pregnancy" provided "definite notice to ordinary persons that the unborn are protected from the moment of fertilization"), *appeal dism'd,* 85 Ohio St.3d 1477, 709 N.E.2d 849 (Ohio 1999); *Commonwealth v. Bullock,* 868 A.2d 516, 522 (Pa.Super.2005) (holding Pennsylvania Legislature clearly intended to protect unborn children when enacting voluntary manslaughter statute that incorporates definition of "unborn child" as "individual of the species homo sapiens from fertilization until live birth"), *appeal granted,* 584 Pa. 705, 885 A.2d 40 (2005); *State v. MacGuire,* 84 P.3d 1171, 1177 (Utah 2004) (concluding phrase "unborn child" provided kind of notice that enabled ordinary people to understand what conduct was statutorily prohibited; therefore, statute not unconstitutionally vague).

In reaching this conclusion, we reject appellant's complaint that the statute is rendered unconstitutional because it fails to deal with the concept of viability as that concept was discussed by the United States Supreme Court in *Roe v. Wade.* In *Roe,* the Supreme Court discussed at which point a fetus is viable, i.e., when the fetus is "potentially able to live outside the mother's womb." *Roe,* 410 U.S. at 160, 93 S.Ct. 705. The Court did so in the context of discussing a woman's privacy interest in determining whether to terminate her pregnancy and the state's interests of preserving and protecting the health of a pregnant woman and protecting the potentiality of human life. *Roe,* 410 U.S. at 162, 93 S.Ct. 705. According to the Supreme Court, the woman's and the state's interests are separate and distinct, but "[e]ach grows in substantiality as the woman approaches term and, at a point during the pregnancy, each becomes 'compelling.'" *Roe,* 410 U.S. at 162–63, 93 S.Ct. 705. The Court further concluded that the state's "important and legitimate interest in potential life" becomes a compelling interest at viability; therefore, if the state were interested in protecting fetal life after viability, the state might "go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother." *Roe,* 410 U.S. at 163–64, 93 S.Ct. 705.

The rights and interests addressed by the *Roe* Court, however, are not the same as those at issue in this case. In *Roe,* the Court was attempting to balance the privacy rights of a woman seeking to terminate her pregnancy with the state's interest in protecting the woman's health as well as the life of her unborn child. In this case, appellant murdered Smith and her unborn child. Obviously, appellant has no constitutional right to murder a pregnant woman. The State's interest in this case is in protecting its citizens and their unborn children from murder and imposing maximum criminal liability on individuals such as appellant who, by his own criminal conduct, terminated Smith's pregnancy at the same time he ended Smith's life. Thus, the individuals' and states' interests at is-

sue in the two cases are clearly distinguishable.

The Texas Legislature was well aware of the Supreme Court's discussion on viability in *Roe* but chose not to incorporate fetal viability in the capital murder statute. In doing so, the legislature made a significant distinction between a woman's legal right to terminate her pregnancy and the prosecution of a third party's murder of the unborn child without the woman's consent. *State v. Rollen,* 133 S.W.3d 57, 63 (Mo. App. E.D.2003); *see* TEX. PEN.CODE ANN. § 19.06 (Vernon Supp.2006)[1]. When a woman's privacy interests are not implicated, the legislature may determine whether, and at what point, the life of her unborn child should be protected. *See People v. Davis,* 7 Cal.4th 797, 30 Cal.Rptr.2d 50, 872 P.2d 591, 599 (1994). The legislature's decision not to consider the viability of a fetus when imposing maximum criminal liability on an actor who murders a pregnant woman does not somehow render the statute vague or unconstitutional. *See Merrill,* 450 N.W.2d at 324 (holding statute not unconstitutionally vague even though statute does not address viability); *Bullock,* 868 A.2d at 522 (same).

Because the statute clearly defines when criminal liability attaches for harming a fetus, we conclude the statute is not unconstitutionally vague and that the statute, as written, gives fair notice to individuals, specifically appellant, that such activity is proscribed by section 19.03(a)(7). We overrule appellant's second issue.

### Indictment

■■■ In his first issue, appellant contends the indictment failed to allege an offense with the degree of certainty necessary to give appellant notice of the particular offense with which he was being charged. Under this issue, appellant claims the indictment failed to provide him a description of one of the victims that would enable appellant to anticipate the State's evidence and prepare an adequate defense. We disagree.

■■■ The sufficiency of an indictment is a question of law. *State v. Moff,* 154 S.W.3d 599, 601 (Tex.Crim.App.2004). Therefore, we review a trial judge's ruling on a motion to quash the indictment de novo. *Moff,* 154 S.W.3d at 601.

■■■ An accused in a criminal case is guaranteed the right to demand the nature and cause of the action against him. *DeVaughn v. State,* 749 S.W.2d 62, 67 (Tex.Crim.App.1988); *Smith v. State,* 895 S.W.2d 449, 453 (Tex.App.-Dallas 1995, pet. ref'd). A charging instrument that tracks the language of a criminal statute generally possesses sufficient specificity to provide a defendant with notice of a charged offense. *State v. Edmond,* 933 S.W.2d 120, 128 (Tex.Crim.App.1996); *State v. York,* 31 S.W.3d 798, 800 (Tex. App.-Dallas 2000, pet. ref'd). A motion to quash an indictment should be granted only when the language regarding the accused's conduct is so vague or indefinite

---

1. Section 19.06 provides that Chapter 19 of the penal code does not apply to the death of an unborn child if the conduct charged is
    (1) conduct committed by the mother of the unborn child;
    (2) a lawful medical procedure performed by a physician or other licensed health care provider with the requisite consent, if the death of the unborn child was the intended result of the procedure;
    (3) a lawful medical procedure performed by a physician or other licensed health care provider with the requisite consent as part of an assisted reproduction as defined by Section 160.102, Family Code; or
    (4) the dispensation of a drug in accordance with law or administration of a drug prescribed in accordance with law.
    TEX. PEN.CODE ANN. § 19.06.

that it fails to give the accused adequate notice of the acts he allegedly committed. *DeVaughn*, 749 S.W.2d at 67.

In this case, the indictment alleged that appellant did

> unlawfully then and there intentionally and knowingly cause the death of an individual, to-wit: [Smith], by shooting [Smith] with a firearm, a deadly weapon, and during the same criminal transaction [appellant] did then and there intentionally and knowingly cause the death of another individual, to-wit: an unborn child of [Smith], by shooting [Smith] while said unborn child was in gestation of said [Smith].

The indictment clearly tracks the language of sections 19.02(b)(1) and 19.03(a)(7)(A) and incorporates the definition of individual set forth in section 1.07(a)(26). Having previously concluded section 19.03(a)(7)(A) gives fair notice to individuals that criminal liability attaches to the murder of a woman and her unborn child and that it is not unconstitutionally vague, we conclude the indictment in this case—which tracks the statute as written—was sufficient to apprise appellant of the offense with which he was charged. We cannot conclude the trial judge erred in denying appellant's motion to quash the indictment. We overrule appellant's first issue.

We affirm the trial court's judgment.