In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-07-00775-CR
 

 
 
JOE NATHAN SANDERS, JR., Appellant
 
V.
 
THE STATE OF TEXAS, Appellee
 


On Appeal from the 182nd District Court
Harris County, Texas
Trial Court Cause No. 1114820



MEMORANDUM OPINION
          A jury found appellant, Joe Nathan Sanders, Jr., guilty of capital murder in the
deaths of Angela Alex and her unborn child. The State did not seek the death penalty,
and punishment was assessed at lifetime confinement without parole. 
          On appeal, appellant challenges his conviction for capital murder by arguing
that the evidence presented at trial was factually insufficient to support his conviction
for murder of either Angela or her unborn child. Appellant also challenges his
conviction by arguing that his conviction for murdering an unborn child violates the
Establishment Clause of the United States Constitution, and that the current Penal
Code definitions of “individual” and “death” violate the Eighth Amendment of the
United States Constitution.
          We affirm.
Background
          Appellant is the father of Angela’s nephew and the ex-boyfriend of Angela’s
sister. In the summer and fall of 2005, Angela frequently baby-sat her nephew, and
at some point, she entered into a sexual relationship with appellant. In October 2005,
Angela informed her sister that appellant had forced her to have sex with him and that
she was pregnant with appellant’s child. According to the testimony of Hiawatha
Duncan, a medical assistant at a downtown ob/gyn clinic that also provides abortions,
Angela made appointments at the clinic in October 2005, but did not show up for the
appointments. 
          Prior to her death, Angela lived with her three sons and common-law husband,
Steven Green. Angela’s 14-year-old son Brandon testified that, on November 1,
2005—sometime between 8:30 and 9:15 p.m.—Angela left the home, driving her
Ford Explorer. After she left the house, Brandon watched a television program with
Steven, and then went to bed. Brandon heard Steven open the front door at some
point in the evening, and then heard Steven go to bed. According to Brandon, Steven
normally smoked a cigarette outside the front door rather than inside the house. 
Brandon also testified that Steven and Angela fought occasionally, and that Steven
had a brother, Jesse, who sometimes came to the home inebriated.  
          Steven Green testified that he was the common-law husband of Angela, and the
father of three of her sons. Steven stated that, prior to her death, he believed he was
the father of Angela’s unborn child and that he did not believe she had any other
boyfriends. Steven spoke on the telephone with Angela several times during the day
of November 1, 2005, and again that evening when he arrived home. When Steven
arrived home, he saw Angela standing outside speaking with another woman who
came to pick up appellant’s son. When Angela left their home that night around 9:00
p.m. without explanation, he assumed that she was going to do some Christmas
shopping at Wal-Mart. After noticing at 11:00 p.m. that Angela had not yet returned
home, Steven called her cell phone but Angela did not answer. He then went to sleep
and was next awakened by police officers at his home. 
          At approximately 10:30 p.m. on November 1, 2005, the partially clothed body
of Angela Alex was discovered lying in an unlit roadway near the intersection of I-45
and Rankin Road. When police and emergency personnel arrived, they discovered
that Angela was dead, having been shot twice in the head. They also observed that
she suffered multiple scrapes and bruises and that her shoes and shirt were removed
and her pants torn. Angela held a hairpiece and a small white towel in her hands. 
Her cell phone was still attached to the waistband of her pants. One officer observed
that she appeared to be visibly pregnant. 
          When police arrived, Angela’s Ford Explorer was parked nearby with the keys
in the ignition, the driver’s window open, and the parking lights on. Angela’s blood
was found on the outside of the Explorer. Crime scene investigators retrieved several
items from inside the Explorer, including Angela’s purse, an envelope containing
twenty-five $20 bills, two ATM withdrawal slips totaling $1000, and an envelope
addressed to Angela, on which appellant’s name, license plate and vehicle description
were written in purple ink in Angela’s handwriting. The envelope with appellant’s
name hand-written on it had been sent to Angela by the Child Support Division of the
Office of the Attorney General of Texas, and was postmarked October 6, 2005. The
envelope contained a blank “Application for IV-D Services,” requesting information
for collection and enforcement of child support, including the vehicle description and
license plate number of the person from whom support was sought. A purple pen and
$60 in cash were found inside of Angela’s purse. 
          Various items, including two spent .22-caliber shell casings, two live .22-caliber shells, and a beer can that appeared to have been recently discarded, were also
recovered from the scene. The beer can was found approximately 133 feet from
Angela’s body, along with a shoe and her jacket. Appellant’s DNA was subsequently
discovered to be on the beer can, but no fingerprints were recovered from the can. 
Appellant’s fingerprints were not found within Angela’s vehicle or elsewhere at the
scene—the only fingerprints recovered from the Explorer were those of Angela and
Steven Green. Upon examining Angela’s cell phone, however, police noted that she
had placed calls to appellant at 7:16 p.m. and 9:13 p.m. that evening, and that the
latter was the last call she made before her estimated time of death. Angela’s cell
phone also showed that, at 8:45 p.m. on the night of her death, she received a call
from a payphone located at a gas station less than three miles from where her body
was found. Police were not able to retrieve surveillance tapes, eyewitnesses or
fingerprints from that payphone location. 
          An examination of Angela’s body revealed the DNA of an unknown male
person underneath her fingernails. Although that DNA was compared against
appellant’s and other men Angela knew, it was not compared against that of any of
her three male children and none of them were therefore excluded as possible sources
of the DNA. In addition, the DNA analyst who testified acknowledged it is not
uncommon to find trace amounts of unknown DNA under a person’s fingernails. 
Police were not able to identify the caliber of the bullet and fragments recovered from
Angela’s body. 
          Police interviewed appellant at least twice. On March 21, 2006, appellant
voluntarily came to the police station, without a subpoena or being under arrest. The
first time appellant was interviewed by police, he brought his girlfriend, Tameka
Stevens, along with him. Police interviewed appellant and Tameka separately. 
Appellant was described as being polite, soft-spoken and cooperative. When asked,
appellant consented to give a DNA sample. Appellant denied having a sexual
relationship with Angela and denied that he was in the area of her murder on
November 1, 2005. Appellant did admit, however, to speaking to Angela the night
she died. Appellant claimed that Angela asked him for money to pay for the gas she
used when picking up her nephew, appellant’s son, for babysitting. Appellant told
police at that time that he worked until 9:00 p.m. in Port Arthur, approximately 90
miles away from where Angela was killed. Appellant also gave police a list of co-workers and told police that, at the time Angela was murdered, he was driving these
various co-workers to their homes after their workday had ended. Appellant
acknowledged, however, having his cell phone with him on that day. Tameka
Stevens confirmed her cell phone number, as well as appellant’s, for the police, and
confirmed that appellant arrived home at approximately 11:00 p.m. on November 1,
2005. 
          In appellant’s second interview in May 2005, police confronted him with the
DNA results showing that he was the father of Angela’s unborn child, and with the
letter Angela wrote to her sister. Appellant continued to deny having a sexual
relationship with Angela, and he was arrested later that day for Angela’s murder. 
          At trial, Tameka testified that appellant was working in Port Arthur on
November 1, 2005 and that appellant would regularly drop off co-workers after work. 
Tameka stated that she picked up appellant’s son from Angela’s house on the evening
of November 1, 2005, and had not spoken to Angela after that. Tameka stated that
it was not until appellant called her the next day, asking why Angela failed to pick up
his son at school as scheduled, that she learned Angela had been murdered.           Tameka testified that she spoke to appellant at 9:30 p.m. on the night of
November 1, 2005, and that he told her he was dropping off co-workers and would
be home soon. According to Tameka, appellant arrived home at 10:00 p.m. and that
he was wearing his normal work clothes and was in a good mood. Tameka stated that
appellant’s clothes that evening were not torn, ripped or bloody. She also stated that
she did not see any scratches or bruises on appellant that evening. Tameka denied that
she previously told police that appellant had not arrived home until 11:00 p.m. that
evening. Tameka also testified that appellant paid child support for her three children
and, in addition to his son with Angela’s sister, also had another daughter, Victoria,
who did not live with them. Tameka stated that appellant did not pay formal child
support for his daughter but instead just gave the girl’s mother money when she asked
for it. At trial, appellant admitted that he had known Angela for eight or nine years,
and that he first met her while dating her sister. Appellant testified that he gained
custody of Joseph, his son with Angela’s sister, when the child was two months old
and that he also sought custody of Joseph’s half-brother, even though he was not that
child’s father. Appellant then met Angela again in May of 2005, and she expressed
an interest in babysitting her nephew. At trial, appellant admitted that he and Angela
entered into a sexual relationship in June of 2005, even though he was still living with
Tameka Stevens at the time. Appellant testified that he and Angela would meet in
various locations. Appellant admitted that he lied to police about having an affair
with Angela, and stated that he lied because he didn’t want his girlfriend and family
to find out that he had been having an affair. Appellant also admitted that he knew
in November 2005 that Angela was pregnant, but he claimed that Angela never told
him he was the father of her unborn child. Appellant stated that, if Angela had told
him she was pregnant with his child, he would have accepted his responsibility
towards the child. However, appellant acknowledged that he had previously been
sued for child support for his other children. 
          At trial, for the first time, appellant attempted to explain the presence of his
DNA on the beer can found at the scene of Angela’s death. Appellant testified that
the last time he saw Angela alive was on October 30, 2005. According to appellant,
he met Angela approximately three blocks from an apartment complex where she kept
an apartment she sometimes visited on weekends. Appellant stated that he drove to
the location where they were to meet, parked behind Angela’s car, and then stood by
the side of her car, talking to her about Joseph, gas money, and when he would be
able to next spend time with her. According to appellant, prior to meeting that day,
he requested that Angela bring some Crown Royal whiskey for him to drink. Instead,
he stated that she brought him a can of Budweiser beer, which he did not usually
drink. Appellant stated that he drank some of the beer Angela gave him, but did not
testify as to what he did with the can after drinking it. 
          On November 1, 2005, appellant testified that he was working in Port Arthur
until 6:30 or 7:00 p.m., and that he then drove an hour and a half back to Houston to 
drop off his co-workers. Although he could not be sure who was in the car with him
on that night, Appellant named several co-workers at trial, including a Cornel Clay,
“Joe Joe,” Francis, Alex, Matt, Roy and Derrick, that he regularly dropped off. 
According to appellant, he drove these co-workers to various locations, including
near downtown Houston and Acres Homes. Appellant testified that he then “hung
out” in the Acres Homes area, drinking Crown Royal, with various co-workers for
approximately 45 minutes. After leaving the Acres Homes area, appellant stated that
he traveled to the area near I-45 and Rankin Road to drop off two additional co-workers. Appellant then stated that he arrived at his home at approximately 10:00
p.m. Appellant was not able to give the addresses or contact information for any of
these co-workers when he testified at trial, even though he claimed that he had been
driving them home for at least a month before the night Angela died. Further,
appellant admitted that he did not give police the contact information for his
employer so that his co-workers could be interviewed. Finally, the list of co-workers
appellant claimed that he drove home that night differed from a written list he
previously gave to police. 
          In his testimony, appellant denied killing Angela and denied being at the
location where she was killed. He also denied owning a .22-caliber firearm or having
access to one at the time Angela died. Appellant admitted that he did not pay child
support for his daughter Victoria, despite having been ordered to do so. Appellant
also admitted that Angela called him several times on the night she died, including
calls at 9:01 p.m., 9:04 p.m. and 9:13 p.m. 
          Appellant’s cellular phone records on the night in question were admitted into
evidence. The records showed that Angela called appellant at least 22 times that
evening. A Houston police officer who specialized in telephone records and cellular
phones testified at trial that appellant’s cell phone records were used to track his
general movements on the night of November 1, 2005. At 7:00 that evening,
appellant’s cell phone was in the Baytown area. At 7:45 p.m., appellant’s cell phone
was located in the Acres Homes area. From 9:00-9:13 p.m., appellant’s cell phone
was located in the I-45/Rankin road area, in very close proximity to where Angela
was shot. At 9:45 p.m., appellant’s phone was located approximately 2.5 miles north
of the crime scene, after which the phone was not able to be tracked due to lack of use
or being turned off. The next time the phone was tracked, it was near appellant’s
home on the morning of November 2, 2005. The officer testifying to the data
admitted that it was not possible to determine appellant’s exact location based on his
cell phone records. He stated, however, that while it was not possible to know
whether or when appellant was at the exact location where Angela died, appellant’s
phone was “in the neighborhood,” within a mile of that location. The testifying
officer also admitted that it was not possible to know whether it was appellant or
another person using the phone at the times in question, although appellant had
previously admitted to possessing it for the entire evening. 
Factual Sufficiency of the Evidence
          In his first and second issues, Appellant contends that the evidence is factually
insufficient to support the jury’s verdict that he is guilty of capital murder. 
          In a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if the proof of guilt is so
obviously weak as to undermine confidence in the jury’s determination, i.e., that the
verdict seems “clearly wrong and manifestly unjust,” or the proof of guilt, although
legally sufficient, is nevertheless against the great weight and preponderance of the
evidence. Watson v. State, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006). Such
a wrong and unjust verdict includes instances in which the jury’s finding is
“manifestly unjust, ‘shocks the conscience,’ or ‘clearly demonstrates bias.’” Watson,
204 S.W.3d at 426. We cannot conclude that a conviction is “clearly wrong” or
“manifestly unjust” simply because, on the quantum of evidence admitted, we would
have voted to acquit had we been on the jury. Id. at 417. Similarly, we also cannot
declare that a conflict in the evidence justifies a new trial simply because we disagree
with the jury’s resolution of that conflict. Id. Before finding that evidence is
factually insufficient to support a verdict, we must be able to say, with some objective
basis in the record, that the great weight and preponderance of the evidence
contradicts the jury’s verdict. Id. In our factual-sufficiency review, we must also
discuss the evidence that, according to the appellant, most undermines the jury’s
verdict. Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).
          We note that a jury is in the best position to evaluate the credibility of
witnesses. Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006); Cain v.
State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). “Appellate courts should afford
almost complete deference to a jury’s decision when that decision is based upon an
evaluation of credibility.” Lancon v. State, 253 S.W.3d 699, 705 (Tex. Crim. App.
2008). The fact-finder alone determines the weight to be given contradictory
testimonial evidence because that determination depends on the fact-finder’s
evaluation of credibility and demeanor. Cain, 958 S.W.2d at 408–09. As the
determiner of the credibility of the witnesses, the fact-finder may choose to believe
all, some, or none of the testimony presented. Id. at 407 n.5; Lancon, 253 S.W.3d at
707. 
            Murder of Unborn Child
          In his first issue, appellant contends that the evidence is factually insufficient
to support his conviction. As charged, to prove that appellant committed the offense
of capital murder, the State had the burden of proving beyond a reasonable doubt that
appellant committed murder under section 19.02(b)(1) of the Penal Code and
“murder[ed] more than one person . . . during the same criminal transaction.” Tex.
Penal Code Ann. § 19.03(a)(7)(A) (Vernon Supp. 2008). Under Texas Penal Code
section 19.02(b)(1), a person commits murder if he “intentionally or knowingly
causes the death of an individual.” Id. § 19.02(b)(1). “A person acts intentionally
with respect to . . . a result of his conduct when it is his conscious objective or desire
to . . . cause the result.” Id. § 6.03(a). “A person acts knowingly . . . with respect to
a result of his conduct when he is aware that his conduct is reasonably certain to
cause the result.” Id. § 6.03(b).
          In the Texas Penal Code, “‘[p]erson’ means an individual . . . .”; “‘[i]ndividual’
means . . . an unborn child at every stage of gestation from fertilization until birth”;
and “‘[d]eath’ includes, for an individual who is an unborn child, the failure to be
born alive.” Id. § 1.07(a)(26), (38), (49). “It follows from these provisions that a
person who intentionally or knowingly causes the death of a woman and her unborn
child, at any stage of gestation, commits capital murder.” Lawrence v. State, 240
S.W.3d 912, 915 (Tex. Crim. App. 2007). The statute exempts conduct committed
by a woman who chooses to terminate her own pregnancy or by a healthcare provider
terminating the pregnancy of a consenting patient. Tex. Penal Code Ann. § 19.06
(Vernon Supp. 2008).
          Appellant argues that evidence presented at trial would not have allowed a
rational juror to conclude, beyond a reasonable doubt, that he had knowingly or
intentionally caused the death of Angela’s unborn child. Appellant essentially argues
that, assuming the evidence is sufficient to establish that he intended to harm Angela,
there is no evidence that he acted with any intent to harm her unborn child or that he
took any actions with the awareness that the child’s death would be reasonably
certain to result. With respect to the latter argument, Appellant specifically points to
what he describes as “the wide variety of medical opinions on the likelihood that a
particular unborn child, at a particular gestational stage, when subjected indirectly to
a particular injury caused to its mother, will or will not be born alive.” We note that
no evidence of such a “wide variety of medical opinions” appears in the record, and
that the medical examiner specifically testified that the unborn child had a gestational
age of 16-18 weeks, appeared to be in good health prior to her death, and that the
cause of the child’s death was the death of Angela by gunshot to the head. 
          Factual sufficiency does not require that each fact point directly and
independently to the defendant’s guilt; rather, the verdict will withstand a factual
sufficiency challenge as long as the combined and cumulative force of all the
circumstances permits the conclusion that the jury was rationally justified in finding
the defendant guilty of each element of the crime beyond a reasonable doubt. 
Johnson v. State, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). Further,
circumstantial evidence can be sufficient to prove culpable mental state. See, e.g., 
Ledesma v. State, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984). 
          We also note that intent is a question of fact within the sole purview of the jury;
the jury may rely on its collective common sense and apply common knowledge and
experience. Brown v. State, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). Intent
may be inferred from the circumstantial evidence surrounding the incident, including
the acts, words, and conduct of the accused. See Manrique v. State, 994 S .W.2d 640,
649 (Tex. Crim. App. 1999); Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App.
1995). Moreover, the jury may infer the intent to kill from the use of a deadly
weapon unless it would be unreasonable to infer that death or serious bodily injury
could result from the use of the weapon. Ross v. State, 861 S.W.2d 870, 873 (Tex.
Crim. App. 1992). The Texas Penal Code defines a firearm as a deadly weapon. See
Tex. Penal Code Ann. § 1.07(a)(17)(A) (Vernon 2003).
          After repeatedly denying the relationship to police, appellant admitted that he
had a sexual relationship with Angela and that he knew she was pregnant. Further,
the police recovered an application for child support from Angela’s car with
appellant’s name and vehicle information written on it, and these were among the
pieces of information that Angela needed to fill out the application. While appellant
testified as to his purported willingness to provide for the children already born to
him, the evidence revealed that he did not support all of the children on a regular
basis as ordered and that he had previously been sued for child support by at least one
of the mothers of his children. In addition, appellant admitted that he did not want
his current girlfriend to know that he had a sexual relationship with Angela. Further,
although Angela was visibly pregnant at the time of her death, the unborn child had
a gestational age of 16-18 weeks, and no medical attention was sought after Angela
sustained two gunshot wounds to the head at close range. 
          Appellant points us to Medina v. State, in which the Court of Criminal Appeals
decided that defendant could indeed be found guilty for both knowing and intentional
murder when he fired an automatic weapon into a crowd standing in front of a
residence. 7 S.W.3d 633 (Tex. Crim. App. 1999). Appellant argues that, unlike the
circumstances in Medina, he cannot be found to have knowingly caused the death of
Angela’s unborn child because it was not reasonably certain that the child’s death
would result from Angela’s death. Appellant also points us to Flores v. State, 215
S.W.3d 520 (Tex. App.—Beaumont 2007) aff’d, 245 S.W.3d 432 (Tex. Crim. App.
2008) and Lawrence v. State, 211 S.W.3d 883 (Tex. App.—Dallas 2006) aff’d, 240
S.W.3d 912 (Tex. Crim. App. 2007)— cases in which the defendants were convicted
of murdering unborn children where the facts showed that the defendants intended
to terminate the pregnancies in question while committing their crimes. Appellant
relies on these cases to reiterate his point that, in this case, there is no showing that
he directed any act toward Angela’s unborn child, and the evidence therefore cannot
support the jury’s finding that he intentionally or knowingly caused the death of the
child. 
          We disagree. Although there is no evidence in this case of any direct statement
appellant made indicating his intention to terminate Angela’s pregnancy, as in
Lawrence, or any physical trauma inflicted directly to her womb, as in Flores, the jury
nonetheless could have found that appellant knowingly caused the death of Angela’s
unborn child. Lawrence, 211 S.W.3d at 886–89 (evidence factually sufficient to
support conviction for capital murder for deaths of mother and unborn child where
mother was shot three times, once in the face, with a shotgun after defendant had been
heard to saying he was “going to take care of the problem”); Flores, 215 S.W.3d at 
530 (defendant not entitled to an instruction on lesser included offense of felony
murder, which requires that the murders not have been intentional, where evidence
showed that defendant stood on mother’s stomach twice, from a height, after mother
asked him to “get rid” of her unborn twins). Here, the jury could have inferred from
the evidence that appellant shot Angela in the head at close range with—at a
minimum—an awareness that her unborn child’s death would be reasonably certain
to result from such an act. Like shooting at an occupied residence surrounded by a
crowd of people, as in Medina, shooting a woman whom appellant knew to be
pregnant—and who was visibly so—twice in the head at close range and leaving her
on a dark deserted road, where neither she nor the child would be likely to receive
medical attention, is an act the jury could have found that appellant knew was
reasonably certain to result in the unborn child’s death. See Medina, 7 S.W.3d at 638
(holding evidence was factually sufficient to sustain conviction for knowing murder
where defendant shot a crowd standing in plain sight in front of home he knew was
occupied, and he fired an especially deadly weapon at close range, aimed at human
height). Taking all of the evidence into account, we cannot say that the evidence,
viewed in a neutral light, is so weak that the verdict is clearly wrong and manifestly
unjust or that the proof of guilt is against the great weight and preponderance of the
evidence. See Watson, 204 S.W.3d at 415. We overrule appellant’s first issue. 
          Murder of Angela Alex
           In his second issue, appellant contends that the evidence is factually
insufficient to support his conviction with respect to the death of Angela, particularly
in light of the unidentified male DNA retrieved from underneath Angela’s fingernails.
 Appellant also points out that there was no evidence that he had a criminal record,
that he was prone to violence or that such an offense would have been in keeping
with his character. Appellant also points out that he spoke to police, without being
in custody and without an attorney present, as evidence of his innocence. Finally,
appellant seeks to discount the evidence against him—including the evidence that
Angela was going to seek child support and the beer can with his DNA on it—as
merely circumstantial and too weak to support a verdict against him beyond a
reasonable doubt. Appellant argues that the State’s proposed motive for the death of
Angela, that he wished to hide the affair and avoid additional child support
obligations, are contradicted by appellant’s testimony that he provided financial
support for his other children. 
          In arguing that the circumstantial evidence is too weak to support the jury’s
verdict, appellant points us to Clayton v. State, 235 S.W.3d 772 (Tex. Crim. App.
2007) and Vega v. State, 198 S.W.3d 819 (Tex. App.—Corpus Christi 2006), 
vacated, 267 S.W.3d 912 (Tex. Crim. App. 2008). Neither of these cases supports
appellant’s arguments. In Clayton, the Court of Criminal Appeals specifically relied
on exactly the type of circumstantial evidence present in this case—evidence showing
that the defendant was at the scene of the crime. 235 S.W.3d at 779. In addition, the
Court of Criminal Appeals noted that “although motive is not an element of murder,
it may be a circumstance that is indicative of guilt.” Id. at 781. Similarly, in Vega,
the Court of Appeals noted that “a culpable mental state is almost always proven
through circumstantial evidence.” 198 S.W.3d at 825. 
          Here, the evidence at trial showed that appellant’s DNA was found on a beer
can at the scene of Angela’s murder, close to Angela’s shoe and jacket, which had
been removed. In addition, cell phone records reveal that appellant and Angela were
in contact on the day she died. Cell phone records also place appellant in close
proximity to Angela at the time of her death, although the records cannot pinpoint his
exact location at the time of her death. The cell phone records also show that Angela
attempted to contact him at least 22 times in the hour before she died. Appellant is
the undisputed father of Angela’s child, and there was some evidence that Angela had
claimed appellant forced her to have sex with him against her will. Appellant also
admitted that he did not want his girlfriend and his family to find out that he had a
sexual relationship with Angela, and he also admitted that he was already supporting
several of his children, although not by paying formal child support payments as he
had been ordered to do. Finally, the jury was presented with evidence that appellant
repeatedly lied to police, even when confronted by the cell phone and DNA evidence
against him. Despite the numerous co-workers named by appellant, no alibi witnesses
were produced to corroborate his account of his whereabouts and movements, and his
story regarding those co-workers and movements changed over time. In light of the
fact that their stories appeared to change over time, the jury could have discounted
the testimony of both appellant and Tameka Stevens, who stated that she did not
observe any cuts, bruises or blood on appellant when he came home that night. 
Although there are no eyewitnesses to the crime, no murder weapon was recovered,
and there was no evidence that appellant possessed or had access to a .22-caliber
firearm, in light of all of the evidence and with due deference to the jury’s role in
assessing credibility, we cannot say that the evidence, viewed in a neutral light, is so
weak that the verdict is clearly wrong and manifestly unjust or that the proof of guilt
is against the great weight and preponderance of the evidence. See Watson, 204
S.W.3d at 415. We overrule appellant’s second issue. Constitutional Challenges
          Establishment Clause
          In his third issue, appellant asserts that the Texas Penal Code’s definition of
“individual” violates the First Amendment of the United States Constitution by
endorsing a particular religious belief. See U.S. Const. amend. I; Tex. Penal Code.
Ann. § 1.07(a)(26) (Vernon 2007). Appellant asserts that the State’s definition of
“individual” violates the Establishment Clause because some religions and
denominations thereof believe that human life begins at fertilization and “[t]here is
no basis, other than religious belief, for defining an unborn child ‘at every stage of
gestation from fertilization until birth’ as an individual who is alive.” Appellant
contends the Code has the effect of endorsing religion as it is based solely upon a
religious belief that life begins at conception.
          The Establishment Clause of the First Amendment of the United States
Constitution prohibits Congress from making any law “respecting an establishment
of religion, or prohibiting the free exercise thereof . . . .” U.S. Const. amend. I. This
prohibition extends to state legislatures via the Fourteenth Amendment. Id. amend.
XIV; Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 301, 120 S. Ct. 2266, 2275
(2000). Thus, no legislature may endorse a religion by enacting a law that supports
a religious organization’s religious message. See County of Allegheny v. ACLU
Greater Pittsburgh Chapter, 492 U.S. 573, 600–01, 109 S. Ct. 3086, 3104–05 (1989).
          A statute does not violate the Establishment Clause if (1) the statute has a
secular purpose, (2) its principal or primary effect neither advances nor inhibits
religion, and (3) it does not foster excessive government entanglement with religion.
Lemon v. Kurtzman, 403 U.S. 602, 612–13, 91 S. Ct. 2105, 2111 (1971). Concerning
the first Lemon factor, the State has a legitimate secular interest in protecting mothers
and their unborn children throughout the mother’s pregnancy. Planned Parenthood
of S.E. Pa. v. Casey, 505 U.S. 833, 846, 112 S. Ct. 2791, 2804 (1992); see also
Webster v. Reproductive Health Servs., 492 U.S. 490, 519, 109 S. Ct. 3040, 3057
(1989) (holding State has legitimate interest in protecting potential human life); Roe
v. Wade, 410 U.S. 113, 162, 93 S. Ct. 705, 731 (1973) (holding State has legitimate
interest in protecting lives of pregnant women and human life generally). We
conclude the definition of “individual” serves the State’s legitimate secular interest
in protecting unborn children from the criminal acts of others. See Casey, 505 U.S.
at 846, 112 S. Ct at 2804; Flores v. State, 215 S.W.3d 520, 528 (Tex.
App.—Beaumont 2007, no pet.), aff’d, 245 S.W.3d 432 (Tex. Crim. App. 2008). 
          Further, even appellant acknowledges that a statute is not automatically
rendered unconstitutional simply because it advances ideals that harmonize with
religious ideals. Harris v. McRae, 448 U.S. 297, 319–20, 100 S. Ct. 2671, 2689
(noting that Judeo-Christian prohibition against stealing does not preclude state or
federal legislatures from outlawing larceny). Concerning the second and third Lemon
factors, appellant fails to demonstrate how the statute’s principal or primary effect
advances religion, or how the statute fosters excessive government entanglement with
religion. The statute complies with all three prongs of the Lemon test. See Lemon,
403 U.S. at 612–13, 91 S. Ct. at 2111; see also Flores, 215 S.W.3d at 528. We hold
the statute is valid under the Establishment Clause of the Constitution of the United
States. We overrule appellant’s third issue.
          Eighth Amendment Challenge
          Appellant asserts that the definition of “individual,” when combined with the
definition of “death,” violates the Eighth Amendment of the United States
Constitution. See U.S. Const. amend. VIII; Tex. Penal Code Ann. § 1.07(a)(26),
(49) (Vernon 2003). Appellant maintains that, by redefining “individual” to include
an unborn child and “death” to include the failure of an unborn child to be born alive,
the legislature has effectually created a new aggravating factor to warrant a capital
murder charge without actually drafting it into the capital murder statute. 
Specifically, he asserts that because “the Texas Legislature [sic] has effectively made
any non-consensual termination of a pregnancy eligible for a capital murder charge
and the automatic mandatory, imposition of capital punishment,” the statute is
unconstitutional.
          The Eighth Amendment of the United States Constitution, which applies to the
states via the Fourteenth Amendment, states that “[e]xcessive bail shall not be
required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.”
U.S. Const. amend. VIII. The legislature has the sole responsibility for defining
crimes and their corresponding punishments. Matchett v. State, 941 S.W.2d 922, 932
(Tex. Crim. App. 1996) (citing Granviel, 561 S.W.2d at 515; State ex rel. Smith v.
Blackwell, 500 S.W.2d 97, 104 (Tex. Crim. App. 1973)). For that reason, the
legislature may expand the list of aggravating factors that justify a capital murder
charge. Id. Appellant offers no support for his argument that, by expanding the
definitions of “person” (through the definition of “individual”) and “death,” the
Legislature has violated the Constitution.
          The only authority appellant cites to support his contention that the statute is
“arbitrary and capricious” is Furman v. Georgia, which held that arbitrary,
inconsistent, and discriminatory imposition of the death penalty violates the Eighth
and Fourteenth Amendments. Furman v. Georgia, 408 U.S. 238, 239–40, 92 S. Ct.
2726, 2727 (1972). But Texas’s capital murder scheme, which requires a jury to find
a defendant guilty if it finds at least one of the enumerated aggravating circumstances
present, has been held constitutionally valid because “this system serves to assure that
sentences of death will not be ‘wantonly’ or ‘freakishly’ imposed. . . .” Id. at 941
(citing Jurek v. Texas, 428 U.S. 262, 276, 96 S. Ct. 2950, 2958 (1976)). The
aggravating circumstance that allows for the imposition of capital punishment when
the defendant commits multiple murders in the same criminal transaction sufficiently
narrows the class of murderers who may be charged. Vuong, 830 S.W.2d at 941. The
legislature further narrowed the class of murderers who may be charged by
specifically excluding “conduct committed by the mother of an unborn child” and “a
lawful medical procedure performed by a physician or other licensed health care
provider with the requisite consent, if the death of the unborn child was the intended
result of the procedure” or if the procedure was “part of an assisted reproduction.” 
Tex. Penal Code Ann. § 19.06 (Vernon Supp. 2008).
          When the legislature changed the definitions, it also added section 19.06 to the
Penal Code, which provides several ways in which a person can legally cause an
unborn child to fail to be born alive. Id. § 19.06. The legislature appears to have
surveyed the Penal Code and made all the changes it deemed necessary to include
unborn children in the definitions of terms in the Penal Code. Moreover, the
definition of “individual” has been upheld against an Eighth Amendment challenge
on the grounds of vagueness. See Lawrence, 240 S.W.3d at 915-16. We hold the
definitions of “individual” and “death” do not violate the Eighth Amendment of the
United States Constitution. We overrule appellant’s fourth issue.
Conclusion
          The evidence is factually sufficient to sustain appellant’s conviction for capital
murder in the deaths of Angela Alex and her unborn child. Further, we overrule
appellant’s constitutional challenges to the statutes at issue. Accordingly, we affirm
appellant’s conviction. 
 
 
                                                                        George C. Hanks, Jr.
                                                                        Justice
 
Panel consists of Chief Justice Radack and Justices Alcala and Hanks.

Do not publish. Tex. R. App. P. 47.2(b)